[48 NYS3d 685]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
NATASCHA N. TIGER, Appellant.

Second Department, March 1, 2017

### APPEARANCES OF COUNSEL

*Larkin, Ingrassia & Brown, LLP*, Newburgh (*John Ingrassia* and *Charis Orzechowski* of counsel), for appellant.

*David M. Hoovler, District Attorney*, Goshen (*Robert H. Middlemiss* of counsel), for respondent.

### OPINION OF THE COURT

LEVENTHAL, J.P.

On November 23, 2011, a severely disabled child was admitted to Westchester Medical Center suffering from what appeared to be scald burns. The defendant, a licensed practical nurse who had given the child a bath earlier that day, was subsequently charged with several crimes on the theory that she had burned the child with hot water. The defendant thereafter pleaded guilty to endangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled person, in the first degree, admitting that she had recklessly caused

serious physical injury to the child. Nearly two years later, the defendant moved pursuant to CPL 440.10 to vacate her conviction, primarily alleging that she was actually innocent because medical evidence established that the child's injuries had been caused by an adverse reaction to medications. The main question we are called upon to determine is whether the defendant's plea of guilty is an absolute bar to her maintaining an actual innocence claim pursuant to CPL 440.10 (1) (h). We answer this question in the negative.

Incident

Alejandra A. (hereinafter the child) was born in May 2001. She had profound disabilities. As of November 2011, the child had a permanent tracheostomy and feeding tube, was completely immobile, was blind, and was dependent on others for all activities of daily living. She required 10 to 20 hours of nursing care each day. Home care nurses were responsible for maintaining the child's tracheostomy and feeding tube, bathing her, moving her, feeding her, and giving her medications.

On November 23, 2011, the child was seen by her pediatrician and then taken to Westchester Medical Center (hereinafter WMC) for further treatment. The child had erythema, meaning redness, and bullae, meaning blisters, on her thighs, groin, and under her arms. The blisters had developed over a number of hours. Subsequently, the child underwent wound debridement and skin grafting before being discharged from WMC on January 3, 2012.

Meanwhile, the Orange County Child Abuse Task Force investigated the incident. On November 30, 2011, the defendant, a licensed practical nurse (hereinafter LPN) and the home care nurse assigned to care for the child, made a statement to an investigator in which she stated, in part, regarding the date of the incident:

> "I was working in the . . . home with [the child] who is disabled with cerebral palsy, scoliosis and who is also nonverbal. I arrived about 8:15 that morning and sometime around noon [the child's] mother, and her family left to go shopping leaving only me and [the child] at home. Sometime around 3 p.m., I carried [the child] into the main bathroom where I normally bathe her. I placed [the child] into the bathtub and onto her bath bed which is made up of a mesh like material. I then undressed [the child], covering her trachea and turned on the

water and started rinsing her body. I put the soap on the wash cloth and put the shower handle down in the tub and then washed [the child] with the wash cloth. After I washed her, I rinsed her body again to get the soap off. I was then playing with her hair and rinsing her body and as I moved the water up her body to wash her hair, the water hit my hand and I could feel that the water was very hot. I then turned the cold water on to try to adjust it so it wasn't so hot and then I continued to bathe [the child] and wash her hair. I wrapped [the child] in a towel and took her to her bed and when I pulled the towel down to put lotion on her arms and help her stretch and when I opened the towel more I noticed redness and peeling on her legs. I knew then that I had burned [the child] because the water was too hot when I was bathing her. I then called [the child's] mother . . . and told her that I had just given [the child] a bath and that her skin was red and peeling and [the child's mother] said that her skin does that sometimes. I asked her what I should put on it and she told me to use baby lotion. Just before 5 p.m. [the child's parents] came home and when they saw [the child], [the child's mother] said that the peeling [the child] had was not what she thought I meant when I told her about it on the phone. [The child's mother] called the pediatrician and made an appointment to have [the child] checked out right away and they asked me to go with them to the doctor's office and I did. I knew that I had burned [the child] with the hot water when I called [the child's mother] earlier but was afraid to tell her about what happened when I was bathing her earlier in the day."

That same day, the defendant wrote a letter to the child's mother, stating:

"I am truly sorry about [the child]. I would never hurt her. When I called you to tell you her skin was peeling I was afraid. When you said her skin does that I was relieved and thought everything was OK. I did not want to think I can burn her and believed the doctor when he said this is probably an infection or result of antibiotics. I realize now I believed this because I wanted to.

"I try to put myself in your position and it scares me more. I have been praying for her and your family everyday. It's hard to forgive myself for such an accident and even thought about ending my nursing career and doing something else. I am writing you this because I feel ashamed that a nurse can make such a mistake and I wish I was more responsible that day and I owe you an explanation."

In February 2012, the child's mother, individually and as the child's parent and natural guardian, commenced an action against the defendant and the defendant's employer, Interim Healthcare of Greater New York (hereinafter Interim), to recover damages for personal injuries.

In an indictment dated April 5, 2012, the defendant was charged with assault in the second degree, endangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled person, in the first degree, endangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled person, in the second degree (two counts), endangering the welfare of a child, and assault in the third degree (two counts). The criminal charges were based on the theory that the defendant had either recklessly or with criminal negligence caused injury to the child.

Judgment of Conviction upon the Defendant's Plea of Guilty

On July 24, 2012, the defendant entered a plea of guilty to one count of endangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled person, in the first degree (Penal Law § 260.34 [2]), in full satisfaction of the indictment. At the plea proceeding, the defendant admitted that on November 23, 2011, she was the caregiver for an incompetent or physically disabled person, namely, the child, and that she recklessly caused serious physical injury to the child. The plea proceeding included the following discussion:

"THE COURT: And the People maintain that that bath water that you eventually placed [the child] in was way too hot, and it scalded and burned her. Do you understand that?

"[THE DEFENDANT]: Yes, sir.

"THE COURT: And it is my question to you: Did you test that bath water, like you would under all circumstances, you know, to make sure that it was a proper temperature for bathing a person like that?

"[THE DEFENDANT]: Yes. When I tested it, it was not that hot.

"THE COURT: 'Did you test it when it was finished?' is my question."

After an off-the-record discussion between the defendant and her attorney, the following colloquy took place:

"[THE DEFENDANT]: Yes, sir.

"THE COURT: And the People maintain that the water was too hot, and that the child was burned. What degree burns did she sustain?

"[THE PROSECUTOR]: Third degree burns.

"THE COURT: Do you understand that, third degree?

"[THE DEFENDANT]: Yes.

"THE COURT: Quite obviously, in order for that child to have been burned to that degree, the water had to be hotter than it should have been. Do you understand that?

"[THE DEFENDANT]: Yes.

"THE COURT: Did you make an error when you were testing that water in trying to determine whether it was the proper temperature level for this child?

"[THE DEFENDANT]: Yes.

"THE COURT: And do you realize that that is acting in a reckless manner? Do you understand that?

"[THE DEFENDANT]: Yes.

"THE COURT: And that, by doing that, you recklessly caused these burns to the child. I take it that she was burned on the legs and on the buttocks and that area?

"[THE PROSECUTOR]: Yes, your Honor.

"THE COURT: Do you understand that?

"[THE DEFENDANT]: Yes, your Honor.

"THE COURT: Did the child make noises when this occurred?

"[THE DEFENDANT]: No, sir.

"THE COURT: But this child is a special child, am I right?

"[THE DEFENDANT]: Yes.

"THE COURT: She has trouble speaking in any manner whatsoever, is that a fair statement?

"[THE DEFENDANT]: Yes.

"THE COURT: So, her ability to communicate is vastly limited. Is that a fair statement?

"[THE DEFENDANT]: Yes.

"THE COURT: How much longer was it between this incident and when the child was taken to the hospital? What period of time was this?

"[THE PROSECUTOR]: Several hours, your Honor.

"THE COURT: And you realize that, had you not been reckless, and had you made sure that it would be a proper temperature for a bath for a child of this type, who really can't articulate to you what the problems are, that this event would not have occurred? Do you understand that?

"[THE DEFENDANT]: Yes.

"THE COURT: And that more care should have been taken with this person, because this person is a vulnerable person, this person needs special attention. Is that a fair statement?

"[THE DEFENDANT]: Yes.

"THE COURT: And is it correct that, today, you are admitting to me that you were reckless in the care that you afforded this young child, and thereby caused her this physical injury. Is that correct?

"[THE DEFENDANT]: Yes."

On October 17, 2012, the County Court rendered a judgment of conviction, sentencing the defendant to four months of incarceration and five years of probation. The defendant did not file a timely notice of appeal.

The Defendant's Motion Pursuant to CPL 440.10

By notice of motion dated April 9, 2014, the defendant moved pursuant to CPL 440.10 to vacate the judgment of conviction. Her motion was based on the grounds that she was actually innocent and that she was deprived of the effective assistance of counsel. In the alternative, she sought a hearing on her claims. In support of her motion, the defendant submitted the affirmation of her attorney, her affidavit, and the affirmation of a physician, Bruce F. Farber.

In his affirmation, the defendant's attorney argued that the evidence, including Farber's affirmation, established that the defendant was actually innocent of the crime of which she was convicted. Further, the defendant's attorney contended that the defendant was deprived of the effective assistance of counsel due to the failure of her former attorney to secure pertinent records, such as the results of a biopsy performed on the child, and consult with an expert on matters key to the defense.

In her affidavit, the defendant began by describing her family background and nursing experience. The defendant averred that she had been the primary caretaker for a younger sibling while growing up. After graduating from high school, the defendant bore two sons. From 2003 to 2006, she worked as a home health aide for an elderly patient who had Alzheimer's disease. The services she performed for that patient included bathing the patient. From 2007 to 2010, the defendant was employed as an aide at a facility where she provided care, including bathing, for physically frail and nonverbal residents. After completing an 18-month nursing program, she became an LPN in September 2010. In January 2011, she started working at a facility where she was responsible for wound care and caring for persons who were suffering from Alzheimer's disease. She received only positive evaluations in all of these positions, was never disciplined, and had no adverse incidents involving the people under her care. She stated, "I have been bathing others, in my family and on the job, for the greater part of my life."

The defendant averred that she came "highly recommended" to Interim in November 2011 and was assigned to provide home nursing services to the child. Although the child was essentially noncommunicative, the defendant saw the child cry, and it appeared to the defendant that the child reacted to discomfort by grimacing or breathing fast and heavily. For instance, the child was supposed to wear leg braces "as tolerated," and would grimace when, apparently, the braces were bothering her. One

day after the defendant braided the child's hair, the child's mother told the defendant that the child enjoyed having the child's hair played with.

According to the defendant, bathing the child involved bringing the child into the bathroom, laying her on a mesh cot in the tub, undressing her, covering her tracheostomy tube, washing her, and using a handheld showering device to rinse her. The defendant bathed the child without incident on November 22, 2011.

The defendant next bathed the child on the afternoon of November 23, 2011. The bath took five or six minutes in its entirety. The defendant turned the hot and cold faucets on, tested the water, and adjusted the faucets so that the temperature was appropriate. For the most part, the defendant washed the child with the defendant's left hand while rinsing the child with the showering device in the defendant's right hand. At various points throughout the course of the bath, the water "played" over the defendant's left hand and forearm. The defendant maintained that she never felt that the water was hot, and it was not giving off any steam. The child gave no indication of discomfort. In accord with the defendant's normal practice, she washed the child's hair last and adjusted the temperature beforehand to make the water a bit cooler—as cooler water was better for girls' hair—before rinsing the child's head. The defendant played with the child's hair for a little while before finishing the bath.

After the bath, the defendant wrapped the child in a towel and carried the child to the child's bed. The defendant applied lotion to the child's arms and stretched them. Opening the towel to replace the child's diaper and massage the child's legs, the defendant noticed redness and peeling in the area of the child's thigh. When the defendant tried to wipe the area, skin peeled off. The defendant immediately called the child's mother and reported what she saw. The child's mother told the defendant that the child's skin sometimes peeled, and instructed the defendant to apply baby lotion. Later, when the child's mother arrived home and observed the child, she said that the condition of the child's skin was not normal, and they took the child to the pediatrician. The defendant told the pediatrician that she had given the child a bath and had observed the redness and peeling of the child's skin afterward.

The defendant averred that the following week, she received a call from Interim and was asked to make an appointment to

visit a certain Child Protective Services (hereinafter CPS) office. The defendant scheduled an appointment for November 30, 2011, at 1:30 p.m.

The defendant recalled that she worked a nursing shift that began at 11:00 p.m. on November 29, 2011, and ended at 7:00 a.m. the next morning. After work, she went home to do a number of errands and then was driven to a location where she met with an Interim manager. The Interim manager drove the defendant to the CPS office. In the CPS office waiting room, an investigator told the Interim manager that the manager was not allowed to accompany the defendant. The investigator then escorted the defendant into a conference room.

According to the defendant, the investigator started to ask the defendant general questions about the child's bath on November 23, 2011, and the defendant gave her account. After a time, it became apparent to the defendant that the investigator did not believe her. The investigator confronted the defendant with "terrible, shocking photographs of [the child's] condition—much, much worse than it appeared when [the defendant] had last seen her—which seemed to [the defendant] to depict serious burn injuries." The defendant was stunned and upset, and started gently crying. The investigator, in a stern voice, accused her of boiling water and throwing it on the child. The defendant denied the accusation and again explained what had occurred. The investigator, looking angry and agitated, raised his voice and said that no one would believe the defendant. He then said that he was going to give the defendant time to think and left the room.

The defendant asserted that when the investigator returned to the room, he sat down, held the defendant's hand, and said that he was trying to help her. He said that the defendant would be going to jail for a very long time, but that it would be "safer" for her if she admitted to burning the child, even accidentally. He reminded her that she was the last person with the child and asked how it could be that the child was being treated at WMC's burn unit and getting skin grafting for scald burns if she had not burned the child. The defendant asserted, "I was afraid and confused because I could not explain any of these things, yet did not understand how it was that I could possibly have scalded [the child]."

The defendant claimed that, by that time, she had been at the CPS office for hours. She asked about the Interim manager who had accompanied her and was told that the manager had

left. Although Interim sent a text message to the defendant during the interview, the investigator would not allow her to send a text message in response. When the defendant told the investigator that she needed to call her family, the investigator made her turn off her cell phone. She explained, "Isolated, tired, and confused, I was eventually convinced by [the investigator] that I must have burned [the child] because I could not otherwise explain the photographs, her treatment in the burn unit, or her need for skin grafting." She could not remember what she told the investigator. The investigator suggested that the defendant write a letter of apology to the child's mother and left the room to prepare a written statement. Upon his return, the defendant "looked at the statement but could not focus on the words because I was afraid and worried about getting home. I signed it without reading it."

After being criminally charged, the defendant and her husband retained a criminal defense attorney. The legal fees and costs for bail were a substantial burden for them. In addition to paying a cash retainer, they had to make arrangements to pay additional sums of money to the attorney over a period of time.

The defendant alleged that she told her attorney that she tested the child's bath water, that the water was not hot, and that she did not understand how she possibly could have scalded the child. She also told her attorney that Interim had advised her that the child had something called "Steven Johnson Syndrome," though she did not understand what that was, and asked him how they could "fight" the criminal charges. Her attorney said that they would need to hire a medical expert who would be even more expensive than the lawyers were. The attorney knew that the defendant and her husband did not have the financial wherewithal to hire an expert, as they were having trouble paying the attorney's legal fees. The attorney never raised the possibility of obtaining a court-appointed expert or seeking alternative sources of funding for experts.

According to the defendant, her attorney advised her that if she were to plead guilty, she might, in view of her background, reasonably hope for a sentence of probation and community service, and avoid the risk of a lengthy term of imprisonment. Based on her attorney's advice and her inability to afford medical experts, the defendant agreed to plead guilty. At the plea proceeding, the defendant stated that she had tested the child's bath water and that it was not hot. There was a break in the

proceedings, and the defendant's attorney told the defendant, privately, that she had to admit that the water was hot if she wanted to accept the plea deal. According to the defendant, "Because the prosecutor then stated that [the child] had suffered third degree burns, I acknowledged that the bath water had to have been hotter than it should have been, that I had made an error in testing the water, and that this was reckless conduct which caused these burns."

In his supporting affirmation, physician Bruce F. Farber noted that he had been involved in the practice of internal medicine and infectious diseases from 1980 to the present. He had specialty training in infectious diseases and had treated burn patients and patients diagnosed with toxic epidermal necrolysis (hereinafter TEN). He had reviewed, among other things, the child's medical records and photographs of the child.

Farber gave a narrative of events leading up to and including the child's hospitalization. He noted that on November 16, 2011, a week before the incident in question, the child was evaluated by her pediatrician, who diagnosed pneumonia and prescribed the antibiotic Biaxin. The child had been prescribed Biaxin on at least one other occasion.

Farber opined, based on his review of medical records, photographs, and the defendant's statements, as well as his education and experience in treating patients with TEN and burns, that the child's injuries were caused not by a thermal scald burn from bathing but by TEN.

According to Farber, the family pediatrician and all WMC physicians—emergency room, burn, pediatric, dermatologic, and infectious disease—who evaluated the child on November 23 and 24, 2011 found, based on clinical presentation, that her condition was consistent with TEN, Stevens-Johnson Syndrome (hereinafter SJS), or staphylococcus scalded skin syndrome (hereinafter SSSS). The biopsy results ultimately confirmed a diagnosis of TEN. Despite the history that the child had been bathed shortly before the onset of her condition, none of those physicians diagnosed or even considered a diagnosis of scald burns.

Farber explained that TEN and SJS are life-threatening dermatological conditions thought to be an adverse reaction to medications. While their exact cause is unknown, they are thought to involve an autoimmune process characterized by exfoliation of the skin, i.e., blistering. They often are associated with certain medications and bacterial infections. Drugs

frequently found to be associated with TEN and SJS include antibiotics and antiseizure medications. The child was taking the antibiotic Biaxin as well as an antiseizure medication, Trileptal (Oxcarbazepine).

Symptoms of both TEN and SJS initially are nonspecific and can include a cough, body aches, and feverishness. Typical clinical signs initially include areas of erythema and livid macules on the skin, on which a positive Nikolsky sign can be induced by mechanical pressure on the skin, followed within minutes to hours by the onset of epidermal detachment characterized by the development of blisters and skin sloughing. The top layer of the skin, the epidermis, separates from the lower layer, the dermis, giving an appearance that is very similar to a scald burn. The distinction between TEN and SJS is the extent of skin involved. SSSS results from a staphylococcal bacterial infection and is similar to TEN and SJS in that a toxin released from the bacteria causes the skin layers to separate. The loss of epidermis results in a high risk of infection, loss of fluids, and death. Prompt treatment is required and does not appreciably differ from the treatment burn patients receive.

Farber opined that all of the specially trained physicians and nurses who spoke with the child's parents and the defendant and examined the child within the first 48 hours properly, and in accordance with the standard of care, documented a diagnosis of TEN/SJS, never once mentioning the possibility of scald burns; that the documentation in the child's medical records and the photographs of November 23 and 25 depicted changes of the condition of the child's skin that were consistent with the progression of TEN and inconsistent with scald burns; and that the child's injuries were caused not by scald burns but by TEN. Farber asserted that a pathology report concerning skin biopsies was significant for a diagnosis of TEN and not scald injuries. A dermatologist obtained biopsies to determine whether the child had TEN/SJS or SSSS. The specimens were read by at least four pathologists at WMC, a large teaching hospital, who interpreted them as indicative of TEN/SJS. Farber opined that the skin biopsy pathology report supported the conclusion that the child's injuries were caused not by scald burns but by TEN. Farber stated,

> "Based upon all of the foregoing, including my review of the medical records and photographs, and my education, background and experience as a

board certified internal medicine/infectious disease physician who has treated both TEN patients and burn patients, it is my opinion within a reasonable degree of medical certainty that [the defendant] did not cause scald burn injuries to [the child], and that [the child] was suffering not from scald burns but instead from an adverse reaction to medications, known as [TEN], and resulting complications."

In opposing the defendant's motion, the People argued that although the defendant urged that she was making an actual innocence claim, the materials she submitted in support of her motion made clear that her claim amounted, in large part, to one of newly discovered evidence, and such a claim is only applicable to a judgment based upon a guilty verdict after trial, not a plea of guilty. Besides, the People argued, Farber's affirmation did not constitute newly discovered evidence since it could have been produced with due diligence and was, at best, cumulative with other evidence. The People further argued that a claim of actual innocence was unavailable in a case involving a plea of guilty where, as here, the defendant did not also challenge the voluntariness of the plea.

The People contended that even if the defendant's allegations were treated as a cognizable claim of actual innocence and their merits were considered, the evidence the defendant presented in support of her motion was insufficient to warrant a hearing. According to the People, the defendant's statements were powerful evidence of her guilt, as, in her written statement and her letter, she expressly admitted burning the child, and the allegations she now made regarding the circumstances of her interview were solely supported by her own assertions. Plus, the People noted that the evidence the defendant submitted in support of her motion must be viewed in light of the fact that the defendant already admitted that she was guilty of the crime she now denied committing.

The People urged that even assuming that every allegation in Farber's affirmation was true, Farber's affirmation could not prove the defendant's actual innocence because Farber's opinion was merely a single opinion and was the result of ongoing civil litigation in which his opinion was controverted by the opinions of other experts. Moreover, the People noted that physician Joseph Turkowski, a burn specialist at WMC, diagnosed the child's injuries as the result of scalding, and

Farber conceded that TEN usually does not involve the dermis and rarely requires skin grafting, which was required here. The People pointed out that although Farber's opinion was based, in part, on the diagnosis of pediatricians and emergency room doctors who initially treated the child at the hospital, Farber failed to recognize that those diagnoses were based on the information available to the doctors at the time, and such information included the defendant's repeated denials of having used hot water to bathe the child.

Further, the People argued that the defendant's claim of ineffective assistance of counsel lacked merit and should be denied without a hearing because the defendant's former attorney negotiated an advantageous plea offer, and the defendant's allegations about her former attorney's failure to adequately investigate did not cast doubt on the reasonableness of her former attorney's representation. In contesting the defendant's inadequate investigation claim, the People asserted that, according to the defendant's former attorney, he spoke with the attorney representing Interim, who advised that Interim's expert, retained at that time in anticipation of the civil litigation, was of the opinion that the child's injury had, in fact, been caused by scalding. According to the People, the defendant's argument regarding the skin biopsy report presupposed that the report amounted to a "magic bullet" that would have caused virtually any expert contacted by the defense to conclude that the only possible causes for the child's injuries were TEN or SJS; however, as Turkowski's opinion illustrated, that was not so. Moreover, the People argued that the failure to hire an expert witness did not constitute ineffective assistance of counsel. The People contended that a defendant seeking court appointment of an expert had to show indigence, and, given that the defendant was in a position to retain her former attorney, she would have had difficulty making that showing.

In reply, the defendant argued that, contrary to the People's contention, her claim was based, in part, on the ground of actual innocence, not on the ground of newly discovered evidence, and this freestanding actual innocence claim was properly raised regardless of whether she challenged the voluntariness of her plea of guilty. In support of her actual innocence claim, the defendant contended that the plea proceeding was compelling proof not of guilt but of protestations of innocence coupled with admissions driven by the supposition that the child had sustained third-degree burns when, in fact, the child had not sustained scald burns.

In addition, the defendant submitted an affirmation of Mary Mathwich, an attorney associated with the firm of Wilson, Elser, Moskowitz, Edelman & Dicker LLP (hereinafter Wilson Elser). Mathwich stated that Wilson Elser was the attorney of record for the defendant and the defendant's former employer, Interim, in the personal injury action commenced by the child's mother. Mathwich claimed that in July 2012, Wilson Elser consulted a burn physician concerning the child's medical condition following the bath the defendant gave her on November 23, 2011. The consulting physician reviewed the child's medical records, including those from her stay at WMC. The WMC records indicated that a biopsy had been taken to rule out suspected dermatological conditions, including SJS, TEN, and SSSS. The hospital chart indicated that the biopsy was negative. However, the WMC record that Wilson Elser obtained and provided for the consulting physician's review was missing the pathology report. Only much later did Wilson Elser learn that the hospital chart was incorrect and that the pathology report dated December 8, 2011, stated that the biopsy results were, in fact, positive for TEN or SJS.

According to Mathwich, the consulting physician also reviewed photographs taken approximately one week after the November 23rd onset of the child's condition. He requested photographs from an earlier period, closer to the onset of the condition, but Wilson Elser had no such photographs in their possession at the time.

Mathwich claimed that the burn physician Wilson Elser consulted in July 2012 advised, based on his review of an incomplete and, unbeknownst to Wilson Elser, inaccurate medical record, that he could not opine with any degree of certainty whether the child was suffering from scald burns or from a dermatological condition such as TEN or SJS. After meeting with this physician, but prior to the defendant's July 24, 2012 plea proceeding, Mathwich spoke with the defendant's former attorney and conveyed to him the results of the consulting physician's review of the case, as well as the physician's request for photographs taken in proximity to the onset of the child's condition. Mathwich did not speak with the defendant's former attorney again until some time in August 2012, after the defendant's plea was entered.

According to Mathwich, the personal injury action was tried before a jury in April 2014. As a result of the defendant's plea of guilty, the defendant, as well as her former employer,

Interim, which was vicariously responsible for her actions, were collaterally estopped from contesting liability. Consequently, the parties tried the issues of causation and damages only. WMC burn physician Turkowski testified as an expert for the plaintiff. No expert witness testified on behalf of the defense. The jury rendered a verdict in favor of the defendants, answering in the negative the question of whether the care rendered to the child on November 23, 2011, by the defendant was a substantial factor in causing the injuries to the child.[1]

Order Appealed From

By order dated January 12, 2015, the County Court denied the defendant's motion without a hearing. The court determined, in part:

> "Assuming, *arguendo*, that a claim of actual innocence may be raised to vacate a conviction based upon a plea of guilty rather than a verdict after trial, the Court finds that defendant has not made a clear and convincing showing to warrant such relief. Medical evidence supported the allegations contained in the Indictment. Joseph Turkowski, M.D., the Director of the Burn Unit of [WMC], who examined the child and was the child's treating physician for over 40 days, determined that the child's injuries were caused by hot water scalding. The fact that defendant's expert and a civil jury found that the defendant's acts were not the proximate cause of the child's injuries do not rise to the level of establishing, by clear and convincing evidence, that defendant is not guilty of the crime to which she plead guilty. Mere doubt as to the defendant's guilt, or a preponderance of conflicting evidence as to the defendant's guilt, is insufficient to warrant the relief requested since a convicted defendant no longer enjoys the presumption of innocence, and in fact, is presumed to be guilty (See, *Schlup v Delo*, 513 US [298,] 326 n 42, *Herrera v Collins*, 506 US [390,] 398, *People v Hamilton*, [115 AD3d 12,] 27.)
>
> "Defendant's Motion to Vacate based on a claimed Ineffective Assistance of Counsel is denied. In light

---

1. An appeal from the judgment dismissing the personal injury action is currently pending before this Court.

of defendant's statements to police, statements of witnesses and the records of [WMC] attributing the child's injuries to hot water burns, it cannot be said that the failure by defendant's attorney to investigate other causes for the injuries deprived defendant of meaningful representation."

By decision, order, and certificate granting leave to appeal on application, a Justice of this Court granted the defendant's application pursuant to CPL 450.15 and 460.15 for a certificate granting leave to appeal to this Court from the County Court's January 12, 2015 order (see People v Tiger, 2015 NY Slip Op 78525[U] [2d Dept 2015]).

Now, on the defendant's appeal, we reverse the County Court's January 12, 2015 order, and remit the matter to the County Court, Orange County, for a hearing and, thereafter, a new determination on the defendant's motion, to be conducted with all convenient speed.

Actual Innocence

On appeal, the defendant argues that she is actually innocent of committing the crime of which she was convicted upon a plea of guilty.

In People v Hamilton (115 AD3d 12 [2014]), this Court held that a freestanding claim of actual innocence is cognizable in New York, and that a defendant who establishes his or her actual innocence by clear and convincing evidence is entitled to relief under CPL 440.10 (1) (h) (see id. at 15). This Court explained that the conviction or incarceration of a guiltless person runs afoul of the New York State Constitution's Due Process Clause, and that the punishment of an actually innocent person violates the State Constitution's provision prohibiting cruel and unusual punishments (see id. at 26; see also NY Const, art I, §§ 5, 6). We emphasized that clear and convincing evidence is required to establish a claim of actual innocence, explaining:

> "The constitutional violation on a claim of actual innocence is that the defendant is subject to a criminal conviction while he or she is in fact innocent. Mere doubt as to the defendant's guilt, or a preponderance of conflicting evidence as to the defendant's guilt, is insufficient, since a convicted defendant no longer enjoys the presumption of innocence, and in fact is presumed to be guilty" (see People v Hamilton, 115 AD3d at 27).

The Appellate Division, First Department, has also held that CPL 440.10 (1) (h) embraces a claim of actual innocence (*see People v Jimenez*, 142 AD3d 149, 155 [2016]). However, the Court of Appeals has not yet passed upon this issue. In *People v Caldavado* (26 NY3d 1034 [2015]), the Court of Appeals declined to determine whether a freestanding actual innocence claim is cognizable (*see id.* at 1037). The Court said,

> "to the extent defendant's motion was based on a purported 'freestanding actual innocence claim' beyond that provided by CPL 440.10—such as that recognized by the Second Department in *People v Hamilton* (115 AD3d 12 [2d Dept 2014])—we need not pass on the viability of such a claim here; even assuming it is cognizable, defendant failed to demonstrate factual innocence regardless of the applicable standard of proof" (*People v Caldavado*, 26 NY3d at 1037).

■ Turning to the case at bar, we begin by rejecting the People's contention that the defendant's claim of actual innocence is, in actuality, one of newly discovered evidence. A judgment of conviction may be vacated on the ground that

> "[n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence" (CPL 440.10 [1] [g]; *see People v Salemi*, 309 NY 208, 215-216 [1955] [listing the six criteria that a claim of newly discovered evidence must fulfill]).

The People are correct that CPL 440.10 (1) (g) does not apply where a defendant was convicted upon a plea of guilty (*see* CPL 440.10 [1] [g]; *People v Philips*, 30 AD3d 621, 622 [2006]). Here, however, the defendant consistently characterized her claim as based on actual innocence. She never characterized it as based on newly discovered evidence. Further, the defendant acknowledged that, to be entitled to relief on the ground of actual innocence, she must meet the burden of proof, clear and convincing evidence, applicable to a claim of actual innocence

(*see People v Hamilton*, 115 AD3d at 27). That is a more demanding burden than the burden of proof, a preponderance of the evidence, applicable to a claim of newly discovered evidence (*see People v Tankleff*, 49 AD3d 160, 179-180 [2007]). Under all the circumstances, we cannot conclude that the branch of the defendant's motion which was based on actual innocence was, in actuality, based on a different ground.

Next, we consider the People's argument that the defendant's actual innocence claim cannot be maintained in light of her plea of guilty. The People cite to two cases in support of this proposition, *People v Conway* (118 AD3d 1290 [2014]) and *People v Rivera* (117 AD3d 1475 [2014]).

In *Rivera*, the Appellate Division, Fourth Department, concluded that, regardless of whether a claim of actual innocence was cognizable under CPL 440.10 (1) (h), "the claim is not available where, as here, defendant does not challenge the voluntariness of his plea" (*People v Rivera*, 117 AD3d at 1476). The Fourth Department noted that the defendant abandoned on appeal his contention that his plea was not voluntary because he was taking psychiatric medication (*see id.*). In any event, the record supported the conclusion that the defendant's plea of guilty was knowing and voluntary (*see id.*). " 'The "solemn act" of entering a plea . . . should not be permitted to be used as a device for a defendant to avoid a trial while maintaining a claim of factual innocence' " (*id.*, quoting *People v Plunkett*, 19 NY3d 400, 406 [2012]).

Later that year, in *Conway*, the Fourth Department stated,

> "[a]lthough the court erred in determining that a claim of actual innocence may not properly be raised pursuant to CPL 440.10 (1) (h) (*see People v Hamilton*, 115 AD3d 12, 15 [2014]), the court properly determined that defendant's claim of actual innocence was 'belied by his admission of guilt during the plea colloquy' " (*People v Conway*, 118 AD3d at 1290, quoting *People v Conde*, 34 AD3d 1347, 1347 [2006]).

"Indeed, '[t]he "solemn act" of entering a plea, itself sufficing as a conviction, . . . should not be permitted to be used as a device for a defendant to avoid a trial while maintaining a claim of factual innocence' " (*People v Conway*, 118 AD3d at 1290, quoting *People v Plunkett*, 19 NY3d at 406 [2012]).

In *People v Plunkett* (19 NY3d 400), quoted in both *Rivera* and *Conway*, the Court of Appeals discussed the forfeiture doc-

trine. The Court noted that a plea of guilty generally marked the end of a criminal case, not a gateway to further litigation (*see id.* at 405). Thus, the Court had deemed forfeited appellate claims challenging what was competently and independently established by a plea (*see id.*). The Court recounted how, in *People v Thomas* (53 NY2d 338, 340 [1981]), it said that the solemn act of entering a plea, itself sufficing as a conviction, should not be permitted to be used as a device for a defendant to avoid a trial while maintaining a claim of factual innocence (*see People v Plunkett*, 19 NY3d at 406). The Court continued, "By the same token, however, where an appellate claim does not challenge what is legitimately established by a plea or where it has been deemed inconsistent with public policy to submerge an appellate claim within a plea, we have recognized that the forfeiture doctrine should not apply" (*id.*).

In *Plunkett*, the Court of Appeals concluded that in the unusual circumstances presented, where the claim the defendant would raise essentially was that he was never charged with an extant crime, the rationale for the forfeiture doctrine— namely, that what the defendant would challenge had been conclusively and independently established by his or her plea— was not applicable to bar review (*see id.* at 407).

> "To so hold does not impair the legitimate utility of pleas in concluding litigation. And, we signal no departure from the rule that, ordinarily, guilty pleas operate to forfeit appellate claims respecting nonjurisdictional defects in the underlying proceedings. We simply recognize, as we have in numerous other contexts, that pleas are not properly interposed to preclude appellate review of issues that they are not competent to, or for reasons of public policy should not, conclude" (*id.* [citations omitted]).

Similarly, in *People v Sirico* (135 AD3d 19 [2015]), this Court explained that not every claim was forfeited by a plea of guilty (*see id.* at 24). "The issues that survive a valid guilty plea generally relate either to jurisdictional matters, such as an insufficient accusatory instrument, or to rights of a constitutional dimension that go to the heart of the criminal justice process" (*id.*; *see People v Griffin*, 20 NY3d 626, 630 [2013]; *People v Hansen*, 95 NY2d 227, 231 [2000]). " 'The critical distinction is between defects implicating the integrity of the process, which may survive a guilty plea, and less fundamental flaws, such as

evidentiary or technical matters, which do not' " (*People v Sirico*, 135 AD3d at 24, quoting *People v Hansen*, 95 NY2d at 231). "Examples of rights of constitutional dimension which are not forfeited by a guilty plea include the constitutional right to a speedy trial, the protection against double jeopardy, and the competency of the defendant to stand trial" (*People v Sirico*, 135 AD3d at 24).

As we stated in *Hamilton*, the conviction of an actually innocent person "violates elementary fairness [and] runs afoul of the Due Process Clause of the New York Constitution" (*People v Hamilton*, 115 AD3d at 26). Thus, such a conviction implicates a right of constitutional dimension that goes to the heart of the criminal justice process, and is not forfeited by a plea of guilty. Accordingly, we now hold that a defendant's plea of guilty does not absolutely bar that defendant from maintaining a free-standing actual innocence claim pursuant to CPL 440.10 (1) (h). For reasons of public policy, and in view of the state constitutional principles implicated where an innocent person is convicted, a defendant's plea of guilty should not absolutely bar that defendant from proving that she or he did not commit the crime of which she or he was convicted. As the Court of Criminal Appeals of Texas stated:

> "The guilty plea process is not perfect. But guilty pleas allow the parties to avoid the uncertainties of litigation. The decision to plead guilty, as we have seen in this case, may be influenced by factors that have nothing to do with the defendant's guilt. The inability to disprove the State's case, the inability to afford counsel, the inability to afford bail, family obligations, the need to return to work, and other considerations may influence a defendant's choice to plead guilty or go to trial. Being aware of these considerations, we will not preclude actual in-nocence claims because the conviction was the result of a guilty plea" (*Ex parte Tuley*, 109 SW3d 388, 393 [Tex Crim App 2003] [footnote omitted]).

Support for our conclusion that a plea of guilty is not an absolute bar to postconviction relief is also provided by the fact that CPL 440.10 does not, in all instances, limit the avail-ability of such relief solely to defendants convicted after trial. To the contrary, CPL 440.10 (1) (h), unlike, for example, CPL 440.10 (1) (g), is not explicitly limited to judgments of convic-tion after trial. Moreover, the legislature has provided that a

defendant may seek postconviction relief based on forensic DNA testing of evidence performed since the entry of judgment, even where the defendant was convicted after a plea of guilty (*see* CPL 440.10 [1] [g-1] [1]). Where a defendant who has been convicted upon a plea of guilty moves to vacate his or her conviction based on DNA testing, the court may grant vacatur if the test results demonstrate "a substantial probability that the defendant was actually innocent of the offense of which he or she was convicted" (CPL 440.10 [1] [g-1] [1]).[2] Legislative history indicates that the "substantial probability" standard for vacating a postplea conviction based on DNA testing was adopted based upon recommendations from a task force, which recognized "the need to provide a formal mechanism to exonerate the innocent post-plea, while also acknowledging the importance of preserving the integrity of the plea process, maintaining a level of finality in the system and attempting to prevent frivolous petitions from guilty defendants seeking to take advantage of the system" (New York State Justice Task Force, *Recommendations Regarding Post-Conviction Access to DNA Testing and Databank Comparisons* at 3-4 [Jan. 2012]; *see* William C. Donnino, Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 440.10, 2017 Pocket Part at 122).

The case before us illustrates why a defendant's plea of guilty should not absolutely bar that defendant from maintaining a freestanding actual innocence claim. In except the rarest of cases, it reasonably may be assumed that a defendant knows whether she or he did what she or he is admitting by a plea to have done. The Supreme Court of Indiana has stated,

> "It is inconsistent to allow defendants who pleaded guilty to use post-conviction proceedings to later revisit the integrity of their plea in light of alleged new evidence seeking to show that they were in fact not guilty. Both his confession and his new claims cannot be true. A defendant knows at the time of his plea whether [she or] he is guilty or not to the charged crime" (*Norris v State of Indiana*, 896 NE2d 1149, 1153 [Ind 2008]).

However, it has also been pointed out that "while it might be assumed that no one knows better than the defendant whether

---

2. In contrast, the court may vacate the conviction of a defendant convicted after a trial where DNA testing demonstrates "a reasonable probability that the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g-1] [2]).

he [or she] committed the crime, this assumption may not always be true" (*Rhoades v State of Iowa*, 880 NW2d 431, 437 [Iowa 2016]). In such rare cases, a freestanding claim of actual innocence ought to be available. Here, the defendant professed a belief that she did nothing wrong. Allegedly, she was convinced that she must have been responsible for the injuries inflicted, as she was informed that there was no other apparent reason for the child to have sustained such injuries. Scientific evidence suggests that the child's injuries were caused not by scald burns but by an adverse reaction to medications. Indeed, an analogy may be drawn between a case where a defendant moves to vacate a judgment of conviction based on forensic DNA results which may provide strong empirical evidence of innocence (*see* CPL 440.10 [1] [g-1]), and the case at bar where the defendant submitted evidence, including a skin biopsy pathology report, that, according to Farber, supported the conclusion that the child's injuries were caused not by scald burns but by TEN.

■ Having determined that a defendant's plea of guilty does not absolutely bar that defendant from maintaining a freestanding actual innocence claim pursuant to CPL 440.10 (1) (h), we address whether the County Court properly denied, without a hearing, that branch of the defendant's motion which was to vacate the judgment based on actual innocence. Contrary to the People's contention, the defendant is entitled to a hearing on her actual innocence claim. "A prima facie showing of actual innocence is made out when there is ' "a sufficient showing of possible merit to warrant a fuller exploration" ' by the court" (*People v Hamilton*, 115 AD3d at 27, quoting *Goldblum v Klem*, 510 F3d 204, 219 [3d Cir 2007], quoting *Bennett v United States*, 119 F3d 468, 469 [7th Cir 1997]). Here, by submitting her affidavit, Farber's affirmation, and other material, such as the skin biopsy pathology report, the defendant made the requisite prima facie showing (*see People v Jones*, 115 AD3d 984, 986 [2014] [the defendant made the requisite prima facie showing by submitting affidavits from alibi witnesses who, although they had been identified before trial in a notice of alibi, had not testified at trial]; *People v Hamilton*, 115 AD3d at 27 [the defendant made a prima facie showing based on evidence of a credible alibi and manipulation of the witnesses, and the fact that the witness against him had recanted]).

We also note that subsequent to the entry of the defendant's plea of guilty, the civil action against the defendant and her

former employer resulted in a jury verdict in their favor. We are mindful that the burden of proof in a civil trial is different than that in a criminal trial and that the evidence presented at each may differ. However, in the civil trial, the jury found that the defendant's care was not a proximate cause of the child's injuries, despite the fact that the defendant and her former employer were collaterally estopped from contesting liability. Under all of the circumstances presented here, there should be a hearing so that the defendant can attempt to establish her actual innocence by clear and convincing evidence.

"At the hearing, all reliable evidence, including evidence not admissible at trial based upon a procedural bar . . . should be admitted" (*People v Hamilton*, 115 AD3d at 27).

> "If the defendant establishes his actual innocence by clear and convincing evidence, the indictment should be dismissed pursuant to CPL 440.10 (4), which authorizes that disposition where appropriate. There is no need to empanel another jury to consider the defendant's guilt where the trial court has determined, after a hearing, that no juror, acting reasonably, would find the defendant guilty beyond a reasonable doubt" (*id.*).

Ineffective Assistance of Counsel

The defendant further argues that she was deprived of the effective assistance of counsel.

A criminal defendant is guaranteed the effective assistance of counsel under both the Federal and State Constitutions (*see* US Const Amend VI; NY Const, art I, § 6; *People v Turner*, 5 NY3d 476, 479 [2005]). Both the federal and state standards for ineffective assistance of counsel "entail a two-part test, and the first prong under both is the 'objective reasonableness standard,'" as set forth in *Strickland v Washington* (466 US 668, 688 [1984]) (*People v Sanchez*, 124 AD3d 685, 687 [2015]). "The second prong of the federal standard requires a showing of prejudice (*see Strickland v Washington*, 466 US at 687), i.e., a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different" (*People v Sanchez*, 124 AD3d at 687). "The second prong of the New York standard contains a prejudice component focusing on the fairness of the process as a whole rather than the particular impact of counsel's alleged ineffectiveness on the outcome of the case" (*id.*; *see People v Benevento*, 91 NY2d 708, 714 [1998]). "In the context of a plea of guilty, the prejudice prong focuses upon

whether counsel's ineffective performance affected the outcome of the plea process" (*People v Sanchez*, 124 AD3d at 687). "A defendant bears the burden of establishing that he or she was deprived of the effective assistance of counsel by showing the absence of strategic or other legitimate explanations for counsel's performance" (*id.* at 688; *see People v Caban*, 5 NY3d 143, 152 [2005]).

"Essential to any representation, and to the attorney's consideration of the best course of action on behalf of the client, is the attorney's investigation of the law, the facts, and the issues that are relevant to the case" (*People v Oliveras*, 21 NY3d 339, 346 [2013]; *see Strickland v Washington*, 466 US at 690-691). Explaining the importance of conducting an appropriate investigation, the Court of Appeals has stated:

> "An attorney's strategy is shaped in significant part by the results of the investigation stage of the representation. Thus, '[a] defendant's right to representation does entitle him to have counsel conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself time for reflection and preparation for trial' " (*People v Oliveras*, 21 NY3d at 346, quoting *People v Bennett*, 29 NY2d 462, 466 [1972]; *see People v Droz*, 39 NY2d 457, 462 [1976] ["it is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense"]).

█ Here, it appears, based on the proof the defendant submitted in support of her motion, that, despite references in the medical records to a biopsy, the defendant's former attorney did not obtain the skin biopsy pathology report that, according to Farber, supported the conclusion that the child's injuries were caused not by scald burns but by TEN. In addition, the former attorney apparently failed to consult an expert, or to take steps to either seek the services of a court-appointed expert, or find a source of funding to secure the services of an expert. Given the defendant's allegations that she told her attorney that she tested the child's bath water, that the water was not hot, and that she did not understand how she possibly could have scalded the child, as well as her further assertions that she told her attorney that Interim had advised her that

the child had something called "Steven Johnson Syndrome," and that she asked him how they could "fight" the criminal charges, counsel's performance might have affected the outcome of the plea process. Thus, at the hearing, the defendant also should be afforded an opportunity to prove, by a preponderance of the evidence (*see* CPL 440.30 [6]), that her former attorney's representation was ineffective. "Although the remedy for ineffective assistance of counsel generally is to grant a new trial, if the defendant prevails on [her] claim of actual innocence, a new trial would not be necessary" (*People v Hamilton*, 115 AD3d at 28 [citations omitted]).

Conclusion

For the reasons set forth above, the order is reversed, on the law and in the exercise of discretion, and the matter is remitted to the County Court, Orange County, for a hearing in accordance herewith and, thereafter, a new determination on the defendant's motion pursuant to CPL 440.10 to vacate the judgment rendered October 17, 2012, to be conducted with all convenient speed.

ROMAN, HINDS-RADIX and BRATHWAITE NELSON, JJ., concur.

Ordered that the order is reversed, on the law and in the exercise of discretion, and the matter is remitted to the County Court, Orange County, for a hearing in accordance herewith and, thereafter, a new determination on the defendant's motion pursuant to CPL 440.10 to vacate the judgment rendered October 17, 2012, to be conducted with all convenient speed.