People v Tiger (2018 NY Slip Op 04377)

People v Tiger

2018 NY Slip Op 04377 [32 NY3d 91]

June 14, 2018

DiFiore, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 14, 2018

[*1]

The People of the State of New York, Appellant,
v
Natascha Tiger, Respondent.

Argued April 26, 2018; decided June 14, 2018

People v Tiger, 149 AD3d 86, reversed.

{**32 NY3d at 93} OPINION OF THE COURT

Chief Judge DiFiore.

The issue presented by this appeal is whether a claim of actual innocence lies under CPL 440.10 (1) (h) to vacate a judgment of conviction obtained upon a defendant's guilty plea. We hold that defendant's actual innocence claim is not a ground for relief.
I.
Defendant, a licensed practical nurse, was employed as a caregiver for the victim—a profoundly disabled 10-year-old girl. The victim is blind, unable to speak, immobile and dependent upon others for her personal care and needs. On the afternoon of November 23, 2011, while in the sole care of defendant,{**32 NY3d at 94} the victim was bathed using a handheld showering device, while lying on a mesh cot in the bathtub. According to defendant's initial account, as she was applying lotion to the victim after the bath, she observed that the skin on the victim's legs was red and peeling.
The defendant contacted the victim's parents and, upon their return to the home, they immediately sought medical treatment for their daughter. The child's pediatrician, who was informed that defendant had bathed the victim prior to the onset of symptoms, diagnosed the victim with an adverse reaction to Biaxin, an antibiotic that she [*2]had recently been prescribed, and referred the child to Westchester Medical Center (WMC) for further treatment. The initial diagnosis at WMC was likewise that the victim's skin condition—attributed to either Stevens-Johnson syndrome (SJS) or toxic epidermal necrolysis (TEN)[FN1] —was caused by a reaction to her medication. On November 25, the director of the burn unit at WMC examined the victim and concluded that her injuries were more consistent with a scald burn than SJS or TEN. The victim was ultimately treated for third-degree burns and required surgery for skin grafts. She was not released from WMC until January 3, 2012.
Upon a report of the child's condition, an investigation was commenced by the Orange County Child Abuse Task Force. Defendant provided a statement to the authorities in which she admitted that she burned the child with hot water while bathing her. In that statement, defendant indicated that, while bathing the child, "the water hit my hand and I could feel that the water was very hot." Defendant stated that she adjusted the water temperature, finished the bath by washing the child's hair and started to dry the child's body. Defendant also stated that she "noticed redness and peeling on [the victim's] legs. I knew then that I had burned [the child] because the water was too hot when I was bathing her." Defendant subsequently wrote a letter of apology to the victim's mother.
In April 2012, defendant was charged by indictment with assault in the second degree; endangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled{**32 NY3d at 95} person in the first degree; two counts of endangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled person in the second degree; endangering the welfare of a child; and two counts of assault in the third degree.
Following plea negotiations, on July 24, 2012, defendant pleaded guilty to the lesser charge of endangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled person in the first degree in full satisfaction of the indictment. The court, in recording the offer, stated the plea was to a nonviolent felony and the range of sentence was open, but included a consideration of county jail time and probation instead of state prison. In the following comprehensive plea colloquy, defendant, who was represented by retained counsel, affirmed that she understood the rights that she was waiving by pleading guilty and admitted that she was pleading guilty because she was, in fact, guilty. Defendant also admitted that she recklessly caused the victim serious physical injury. The court asked defendant if she had tested the bathwater to make sure that it was not too hot and she responded, "[y]es. When I tested it, it was not that hot." Defendant then engaged in an off-the-record discussion with her attorney and when they came back on the record, the court noted that, in order for the child to have sustained third-degree burns, the water had to be "hotter than it should have been." The court then asked, "[d]id you make an error when you were testing that water in trying to determine whether it was the proper temperature level for this child?" and defendant responded, "[y]es." In response to the court's further questioning, defendant admitted that she was "reckless in the care that [she] afforded this young child, and thereby caused her this physical injury." The guilty plea was accepted and the matter adjourned for sentencing. In September 2012, defendant was sentenced to a split sentence of five years' probation and a concurrent term of four months' imprisonment. Defendant did not move to withdraw her guilty plea before sentence and did not appeal the judgment of conviction.
Separately, the victim's family commenced a personal injury action against defendant and her employer. By virtue of her guilty plea in the criminal action, defendant was precluded from contesting liability in the civil trial. Nonetheless, the civil jury unanimously concluded that the care defendant rendered{**32 NY3d at 96} to the victim was not a substantial factor in the cause of the victim's injuries.[FN2]
On April 9, 2014, defendant moved pursuant to CPL 440.10 (1) (h) to vacate the judgment. She alleged that that her guilty plea was unconstitutionally obtained due to the ineffective assistance of her counsel. She also asserted [*3]a claim of actual innocence relying on the Second Department's decision in People v Hamilton (115 AD3d 12 [2d Dept 2014]), recognizing a freestanding claim of actual innocence pursuant to CPL 440.10 (1) (h). As a remedy, defendant sought vacatur of her conviction and the dismissal of the indictment or, in the alternative, an evidentiary hearing on the factual issues raised. The actual innocence claim was based on the argument that defendant did not cause physical injury to the child, as the child's injuries were attributable to TEN. In support of this claim, defendant provided the hospital medical records and a pathology report of the biopsy results existing at the time of the guilty plea, her own affidavit, and an affirmation from a medical expert retained in connection with the civil action. In her own affidavit, defendant denied her guilt notwithstanding her preaccusatory admissions of guilt and her sworn statements in the plea proceedings.
Defendant also included a transcript of the testimony of Dr. Joseph Turkowski, the treating physician at WMC, who testified in support of the plaintiffs' case at the civil trial. Turkowski opined that the child's serious physical injuries had been caused by scald burns. The conflicting medical opinion offered in the affidavit of defendant's expert as to the cause of the child's injuries also diverged from Turkowski's testimony in other specific respects—particularly, the significance that should be attached to several factors: the positive "Nikolsky sign," the demarcation of the injury, the spread of the condition, the development of cellulitis, and the biopsy results. Significantly, the attached biopsy report, available prior to the guilty plea, stated that the results were consistent with either a diagnosis of TEN (in the absence of oral lesions), or SJS (if oral lesions were present), and indicated that "[f]urther clinical pathologic correlation is recommended."
As to the ineffective assistance of counsel claim, defendant argued that her counsel was ineffective for failing to properly{**32 NY3d at 97} investigate the nature and cause of the child's physical injuries—a material element of the crimes charged. Specifically, she alleged that, despite the fact that the medical records showed a possible alternative and noncriminal cause of the child's injuries (TEN or SJS) and indicated that a biopsy had been taken, counsel failed to obtain the results of that biopsy or consult with a medical expert. Defendant represented that she told her attorney that she had tested the child's bathwater and that it was not hot. She also represented that she told defense counsel that her employer had notified her that the victim was suffering from SJS. Defendant averred that, when they discussed the possibility of consulting an expert, defense counsel—who was aware that defendant was already struggling to pay his legal fees—told her that an expert would be expensive and failed to advise her as to the availability of any alternative source of financial assistance. In addition, defendant asserted that defense counsel advised her that, by pleading guilty, she would likely avoid a lengthy term of state prison. Thus, defendant claimed that, based on counsel's advice and her inability to afford a medical expert, she agreed to plead guilty in exchange for a favorable sentence when she was not, in fact, guilty. Finally, defendant maintained that, when she told the court during the plea proceedings that the water was "not hot," defense counsel privately advised her during an off-the-record conference "that [she] had to admit that the water was hot if [she] wanted to accept the plea deal." She then admitted her guilt.
Opposing the motion, the People argued that defendant's actual innocence claim did not lie under CPL 440.10 (1) (h). The People asserted that, although the Appellate Division recently recognized a freestanding actual innocence claim in Hamilton—a case where the defendant was convicted after trial—such a claim was not available where the defendant entered a voluntary guilty plea. The People also raised arguments in opposition to defendant's ineffective assistance of counsel claim.
County Court summarily denied the 440 motion concluding that, even assuming a claim of actual innocence lies from a guilty plea, defendant failed to provide clear and convincing evidence warranting such relief. The court also rejected defendant's ineffective assistance of counsel claim.
The Appellate Division reversed, on the law and in the exercise of discretion, and remitted the matter to County Court{**32 NY3d at 98} for a hearing on both branches of defendant's CPL 440.10 (1) (h) motion (149 AD3d 86 [2d Dept 2017]). Observing that it had previously recognized the availability of an actual innocence claim under CPL 440.10 (1) (h) in Hamilton, the Court held that defendant's guilty plea did not bar her from seeking such relief. The Court concluded that defendant had established a prima facie showing of actual innocence to warrant a hearing. The Court also held that defendant was entitled to a hearing on her ineffective assistance of counsel claim.
[*4]
The People appeal, pursuant to leave granted by a Judge of this Court (see 29 NY3d 1135 [2017]), and as limited by their brief, from so much of the Appellate Division order as authorized a hearing on defendant's actual innocence claim under CPL 440.10 (1) (h).[FN3] We now reverse.
II.
Defendant, despite her guilty plea, claims that she is entitled to a hearing on the evidence of her guilt or innocence. We hold that CPL 440.10 (1) (h) does not provide for such relief.[FN4]
It is a fundamental precept, acknowledged centuries before our criminal justice system was even created, that the governing laws in criminal matters must protect the innocent accused of a crime from injustice (see Coffin v United States, 156 US 432, 454 [1895] [citing Roman law]). Recent developments, particularly DNA evidence exonerations, have exposed the prevalence of such cases in our system, proving that the system is far more imperfect than previously believed. CPL article 440 is our primary postconviction relief statutory scheme and allows collateral attacks on convictions in a framework of delineated procedural limitations. CPL 440.10 provides 10 specific grounds upon which a defendant may move to vacate a{**32 NY3d at 99} judgment of conviction and is comprehensive in scope. All CPL article 440 motions based upon the existence or occurrence of facts "must contain sworn allegations thereof" (CPL 440.30 [1] [a]). The burden of proof is on the defendant and, at any hearing on the motion, the defendant must prove, by a preponderance of the evidence, every fact essential to support the motion (CPL 440.30 [6]).
As relevant here, CPL 440.10 (1) (h) allows a defendant to move to vacate where the judgment was obtained in violation of a defendant's state or federal constitutional right. Subdivision (1) (h) imposes no time limitation in bringing the motion and is applicable to judgments obtained both through guilty pleas and upon verdict in a trial. This provision is the basis for the commonplace claim that the conviction was obtained due to ineffective assistance of counsel in violation of the Federal and State Constitutions.
In contrast to the claim that a conviction was obtained in violation of constitutional rights and procedures, a claim that the conviction cannot stand due to the production of new evidence inconsistent with guilt must be brought under CPL 440.10 (1) (g). This provision allows a defendant to move to vacate the judgment where "[n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial" (id. [emphasis added]). By its [*5]express terms, this provision is inapplicable to judgments obtained by guilty pleas. Further, this provision has procedural limitations in that it contains two separate due diligence requirements: (1) that the evidence could not have been produced at trial with due diligence; and (2) the motion "must be made with due diligence after the discovery of [the] alleged new evidence" (id.).
In 2012, the legislature added CPL 440.10 (1) (g-1) to allow a specific form of newly discovered evidence—DNA evidence—as a basis to collaterally attack a guilty plea at the postconviction stage. Significantly, that provision is the only one in CPL 440.10 that specifically refers to actual innocence—requiring a factual demonstration that is not necessary for the granting of relief under CPL 440.10 (1) (g). In recognition of the import of a guilty plea conviction that was constitutionally obtained, the legislature enacted different standards that must be satisfied as between a defendant who has pleaded guilty and one who has been convicted upon a verdict after trial. Under CPL 440.10 (1) (g-1), based on DNA results, a defendant who has pleaded guilty must demonstrate a "substantial probability" that he or {**32 NY3d at 100}she is actually innocent, whereas a defendant convicted after trial is held to the lesser standard that there is a "reasonable probability" that the verdict would have been more favorable (CPL 440.10 [1] [g-1]). To be sure, the fact that the legislature has recently carved out a basis to vacate a guilty plea where new evidence of DNA demonstrates actual innocence lends support to the conclusion that CPL 440.10 does not contemplate a separate constitutional claim to vacate a guilty plea based on new evidence as to guilt or innocence (see e.g. Matter of Chemical Specialties Mfrs. Assn. v Jorling, 85 NY2d 382, 394 [1995] ["an inference must be drawn that what is omitted or not included was intended to be omitted and excluded" (citation and internal quotation marks omitted)]). Indeed, the narrow exception for new DNA evidence as a basis to vacate a conviction in plea cases is undoubtedly due to the recognition of the exceptional nature of DNA evidence as a reliable scientific tool to conclusively determine the identity of an assailant.
It is clear from the statutory framework that the legislative purpose in according different treatment to convictions obtained after trial and those obtained by a defendant's guilty plea in the context of newly discovered evidence was to adhere to the principle that a voluntary and solemn admission of guilt in a judicial proceeding is not cast aside in a collateral motion for a new factual determination of the evidence of guilt. This carefully crafted statute explicitly covers the potential avenues and procedural mechanisms available to a defendant who is proclaiming his or her innocence and/or is protesting the procedures employed to obtain that conviction. We have previously held that "[c]ourts, of course, cannot broaden the scope of the remedy afforded by CPL 440.10 beyond what the Legislature unambiguously specified" (People v Machado, 90 NY2d 187, 192 [1997]; People v Jackson, 78 NY2d 638, 647 [1991]). Indeed, "society's interest in [the] finality of judgments" is "formidable" (Jackson, 78 NY2d at 647).
Significantly, a defendant who has entered a valid guilty plea no longer enjoys the presumption of innocence and, in fact, is presumed guilty (see Schlup v Delo, 513 US 298, 326 n 42 [1995]; Herrera v Collins, 506 US 390, 399 [1993]). "A plea of guilty, as we have repeatedly observed, generally marks the end of a criminal case, not a gateway to further litigation" (People v Hansen, 95 NY2d 227, 230 [2000]). "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not{**32 NY3d at 101} thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea" (Tollett v Henderson, 411 US 258, 267 [1973]).[FN5] "This is so because a defendant's conviction rests directly on the sufficiency of [the] plea" (Hansen, 95 NY2d at 230 [internal quotation marks and citation omitted]).
Thus, "a valid guilty plea relinquishes any claim that would contradict the 'admissions necessarily made upon entry of a voluntary plea of guilty' " (Class v United States, 583 US —, —, 138 S Ct 798, 805 [2018], quoting United States v Broce, 488 US 563, 573-574 [1989]). Stated otherwise, a voluntary guilty plea is inconsistent with a claim of factual innocence (see People v Taylor, 65 NY2d 1, 5 [1985]). Therefore, in the absence of a motion to withdraw the plea or to bring a postconviction motion to vacate the plea as involuntary, "the plea and the resulting conviction . . . [*6]are presumptively voluntary, valid and not otherwise subject to collateral attack" (People v Latham, 90 NY2d 795, 799 [1997]).
The plea process is integral to the criminal justice system and we have observed that there are significant public policy reasons for upholding plea agreements, including conserving judicial resources and providing finality in criminal proceedings (see People v Keizer, 100 NY2d 114, 118 [2003]). To that end, we have recognized that a defendant can plead guilty to a nonexistent or legally impossible offense in satisfaction of an indictment that charges a higher offense (People v Foster, 19 NY2d 150, 154 [1967]). Likewise, we allow defendants to plead guilty while maintaining their innocence by entering an Alford plea (see e.g. People v Couser, 28 NY3d 368, 373 n 1 [2016]). Allowing a collateral attack on a guilty plea obtained in a judicial proceeding that comported with all of the requisite constitutional protections on the basis of a delayed claim of actual innocence would be inconsistent with our jurisprudence and would effectively defeat the finality that attends a constitutionally obtained guilty plea.[FN6]
{**32 NY3d at 102}Thus, a guilty plea entered in proceedings where the record demonstrates the conviction was constitutionally obtained will presumptively foreclose an independent actual innocence claim.
Defendant concedes that her collateral attack is not based on the production of newly discovered evidence of actual innocence within the meaning of CPL 440.10 (1) (g).[FN7] The evidence at issue here was not newly discovered. The information regarding TEN/SJS and the existence of the biopsy testing were a part of the victim's medical records, and the possibility of obtaining a medical expert on behalf of defendant had been discussed with defense counsel before the guilty plea was entered. Since the evidence put forth in support of defendant's actual innocence claim was discoverable before the guilty plea had her attorney pursued that course of investigation, defendant's challenge to her conviction falls squarely within CPL 440.10 (1) (h) and will necessarily be addressed as part of her ongoing ineffective assistance of counsel claim.
Moreover, although defendant provided the biopsy results and an expert affidavit to support the conclusion that she was innocent of scalding the victim with hot water, that evidence only raises some doubt as to her guilt by [*7]setting up a battle of experts. It does not establish her factual innocence—particularly in light of the significant barrier presented by her inculpatory statements and guilty plea. Indeed, this is the same type of evidence that we found would have been insufficient to demonstrate factual innocence in People v Caldavado (26 NY3d 1034, 1037 [2015]).
"Judicial recognition of the laudable purposes served by plea negotiations is legion," as is the "rigorous adherence by the courts to a policy of affording guilty pleas a great measure of{**32 NY3d at 103} finality [in order to] immunize plea negotiations from indiscriminate potshots" (People v Frederick, 45 NY2d 520, 525 [1978]; see also People v Selikoff, 35 NY2d 227, 232-235 [1974]; Missouri v Frye, 566 US 134, 143 [2012] ["Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas"]). Permitting a collateral attack on a guilty plea based on a claim of new evidence that contradicts the solemn admission of guilt entered during the course of a judicial proceeding free of constitutional error would have enormous ramifications to the efficacy of our criminal justice system. The legislature has not sanctioned such claims in CPL 440.10 with the exception of the production of DNA evidence demonstrating the identity of the actual assailant, and even that narrow exception has legislatively imposed procedural limitations (see CPL 440.30 [1-a] [a]). Defendant nonetheless asks us to judicially create this extraordinary path for a defendant who has pleaded guilty. We decline to do so.[FN8]
For the above reasons, where the defendant has been convicted by guilty plea, there is no actual innocence claim cognizable under CPL 440.10 (1) (h).[FN9]
Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed and that branch of defendant's CPL 440.10 motion which was based on an independent claim of actual innocence denied.

Garcia, J. (concurring). I join the majority and agree that defendant's "freestanding actual innocence" claim is not cognizable under CPL 440.10 (1) (h). I write separately to emphasize that defendant's "freestanding" claim is foreclosed regardless of whether she raised, or could have raised, an alternative claim.{**32 NY3d at 104}
Defendant was charged with a number of serious crimes based on allegations that she severely scalded a disabled 10-year-old girl while bathing her. In a written statement to the Orange County Child Abuse Task Force, defendant admitted that, while rinsing the child in the bath, "the water hit [defendant's] hand" and she "could feel that the water was very hot." While drying the child, defendant noticed redness and peeling on the child's legs, and defendant "knew then" that she "had burned [the child] because the water was too hot." After confessing to the Child Abuse Task Force, defendant wrote an apology letter to the child's mother. The child's medical records noted a possible diagnosis of Stevens-Johnson syndrome or toxic epidermal necrolysis, potentially due to an allergic reaction, but also stated that, "after further evaluation by the Burn Surgery attending [physician] and negative biopsy results it was determined that the blisters were likely the result of a scald burn."
Following plea negotiations, defendant pleaded guilty to a lesser charge of first-degree endangering the welfare of an incompetent or physically disabled person, in full satisfaction of the seven-count indictment. As part of her plea allocution, defendant stated that she was pleading guilty because she was, "in fact, guilty"—meaning she "did recklessly cause serious physical injury" to "an incompetent or physically disabled person." Specifically, defendant admitted that she "ma[d]e an error" when she was "testing th[e] water in trying to determine whether it was the proper temperature level for th[e] child," and that "more care should have been taken" with the child because she is a "vulnerable person" who "needs special attention." The court informed defendant of the rights that she was "waiving and giving up" by pleading guilty, including her "right to appeal all aspects of th[e] case." Defendant did not move to withdraw her guilty plea before sentencing, nor did she file a direct appeal.
In light of defendant's guilty plea, the case never proceeded to trial. Presumably, the People ceased all efforts to investigate or prosecute defendant's case. The prosecution took no additional testimony, collected no other evidence, never consulted an expert, and pursued no further medical testing. Defendant's plea, the People assumed, "mark[ed] the end of [the] criminal case, not a gateway to further litigation" (People v Hansen, 95 NY2d 227, 230 [2000]).
Nearly two years later, with the safety net of her plea deal, defendant moved pursuant to CPL 440.10 (1) (h), asserting a{**32 NY3d at 105} "freestanding actual innocence" claim and contending that she was denied the effective assistance of counsel. In support of her "freestanding" claim, defendant submitted, among other things, her own sworn statements and certain medical records—contradicted by her earlier sworn statements and by other medical records—contending that she did not cause the child's injuries. Defendant sought vacatur of her conviction and dismissal of the indictment or, alternatively, an evidentiary hearing pursuant to People v Hamilton, where she could present "all reliable [*8]evidence, including evidence not admissible at trial," for the court to re-weigh under a standard of "clear and convincing evidence" (115 AD3d 12, 27 [2d Dept 2014]). In this appeal, defendant contends that CPL 440.10 (1) (h) encompasses the "freestanding" relief that defendant seeks, and that this "freestanding" claim survives her guilty plea.
Defendant has a number of appellate avenues at her disposal to challenge her conviction. A so-called "actual innocence" claim under CPL 440.10 (1) (h) is not one of them.
Under New York law, a defendant who maintains his or her innocence may employ various procedural protections, and pursue an array of challenges, to ensure that guilt or innocence is fairly and reliably determined. Initially, a person charged with a crime may elect to proceed to trial. The defendant may require the People to prove guilt beyond a reasonable doubt, armed with a variety of statutorily- and constitutionally-guaranteed protections designed to secure the fairness of the proceedings. In addition to preserving procedural fairness, these provisions—the right to compulsory process, the right to confront adverse witnesses, the right to the effective assistance of counsel, and the right to a jury trial, to name a few—"have the effect of ensuring against the risk of convicting an innocent person" (Herrera v Collins, 506 US 390, 398-399 [1993]).
Alternatively, a defendant may forgo a trial in favor of a guilty plea. The plea bargaining process, an essential component of our justice system, enables a defendant to concede guilt in exchange for certainty and leniency—oftentimes in the form of a lesser conviction or a more favorable sentence. It also serves a number of critical public policy goals, including conservation of judicial resources and finality in criminal proceedings (see majority op at 
101). Indeed, given the integral role of the plea process in our criminal justice system, "a defendant can plead guilty to a nonexistent or legally impossible offense in satisfaction of an indictment that charges a higher offense" {**32 NY3d at 106}(majority op at 
101, citing People v Foster, 19 NY2d 150, 154 [1967]). Generally, however, in connection with a guilty plea, a defendant must recite the facts underlying the crime, thereby expressly conceding his or her factual guilt (see People v Lopez, 71 NY2d 662, 666 [1988]). A defendant pleading guilty must also knowingly and voluntarily waive a number of rights—including, as a general matter, the right to pursue an appeal.
Once a defendant is convicted, there is "no constitutional entitlement to an appeal" (People v Andrews, 23 NY3d 605, 610 [2014]; Ross v Moffitt, 417 US 600, 611 [1974]). Rather, the appellate process is purely a creature of statute (Andrews, 23 NY3d at 610; People v West, 100 NY2d 23, 26 [2003]). That said, the New York Legislature has enacted an extensive appellate scheme that provides for review of criminal convictions (see People v Romero, 7 NY3d 633, 636-637 [2006]; Andrews, 23 NY3d at 610; see generally CPL arts 440, 450). Under New York's statutory scheme, a defendant may pursue various claims on appeal to directly or collaterally challenge a judgment of conviction.
First, a defendant convicted at trial may bring a direct appeal to challenge the procedural fairness of the proceedings as well as the adequacy of the evidence presented (see CPL 450.10). Grounds for direct appeal may include evidentiary issues, prosecutorial misconduct, ineffective assistance of counsel, and the weight and/or legal sufficiency of the evidence, among others. A defendant who, like defendant here, opts to plead guilty may pursue several, albeit more limited, remedies to challenge her culpability on direct appeal. She may, for instance, challenge the voluntariness of her guilty plea, and may raise certain appellate claims that survive that plea.
A convicted defendant may also move to vacate the judgment pursuant to CPL 440.10, which allows collateral attacks on a conviction based on 10 enumerated grounds, each subject to carefully crafted procedural limitations. One of those enumerated grounds—and the provision invoked by defendant here—is CPL 440.10 (1) (h), which provides that a judgment of conviction may be vacated where it was "obtained in violation of a right of the defendant under the constitution of this state or of the United States" (CPL 440.10 [1] [h]). Defendant contends that this provision sustains her purported "freestanding" claim, and that this "freestanding" claim survives her guilty plea.
But New York's existing framework already contemplates numerous and various relief mechanisms for a defendant who—{**32 NY3d at 107}despite having been convicted—maintains his or her innocence. CPL 440.10 (1) (g), for instance, permits a defendant to move to vacate the judgment of conviction where "[n]ew evidence has been discovered" (CPL 440.10 [1] [g]). That provision, however, contains two different due diligence requirements, and imposes a lofty [*9]standard regarding the caliber of the newly-discovered evidence; it must be "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (id.). That provision is also expressly inapplicable to defendants who have pleaded guilty.
CPL 440.10 also includes a claim explicitly styled "actual[ ] innocen[ce]" (see CPL 440.10 [1] [g-1])—a narrowly-circumscribed remedy recognizing "the exceptional nature of DNA evidence as a reliable scientific tool to conclusively determine the identity of an assailant" (majority op 
100). Specifically, CPL 440.10 (1) (g-1) provides that "a defendant convicted after a guilty plea" may assert that he or she is "actually innocent" based on "[f]orensic DNA testing of evidence performed since the entry of a judgment" (CPL 440.10 [1] [g-1]). Unlike a defendant convicted after trial, however, a defendant who has pleaded guilty must, under this provision, make a heightened showing, "demonstrat[ing] a substantial probability that [he or she] was actually innocent of the offense of which he or she was convicted" (id.).
The CPL's exhaustive list of specified remedies (which already includes a limited "actual innocence" claim) negates any suggestion that the legislature intended to create an additional unenumerated and undefined ground for relief.[FN*] To the contrary, a catchall claim of "actual innocence" would allow a defendant to end run the precise, delineated restrictions and requirements outlined throughout CPL 440.10. And, of course, courts "cannot broaden the scope of the remedy afforded by CPL 440.10 beyond what the Legislature unambiguously specified" (People v Machado, 90 NY2d 187, 192 [1997]; People v Jackson, 78 NY2d 638, 647 [1991]).
Even where these challenges fail, a defendant has further remedies still. A convicted defendant may invoke the common-{**32 NY3d at 108}law writ of error coram nobis under certain limited circumstances—for instance, where "a notice of appeal was not timely filed due to ineffective assistance of counsel" (People v Syville, 15 NY3d 391, 397 [2010]). After exhausting state court remedies, a defendant in custody may apply for a writ of habeas corpus "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States" (28 USC § 2254 [a]). And, as a last resort, a convicted defendant may seek executive clemency—a "fail safe" remedy designed to "prevent[ ] miscarriages of justice where judicial process has been exhausted" (Herrera, 506 US at 411-412, 415; see Executive Law § 19).
Defendant's "freestanding" claim is particularly unavailing in light of her guilty plea. As we have repeatedly held, "[t]he 'solemn act' of entering a plea, itself sufficing as a conviction . . . should not be permitted to be used as a device for . . . maintaining a claim of factual innocence" (People v Plunkett, 19 NY3d 400, 406 [2012]). In other words, a postconviction claim of "actual innocence" is fundamentally inconsistent with the explicit "admission of factual guilt" encompassed by defendant's guilty plea (People v Thomas, 53 NY2d 338, 342 [1981]). Indeed, during her plea allocution, defendant expressly confessed her factual guilt—an admission that was corroborated by much of the record evidence. And because defendants may plead guilty to a lesser (or even nonexistent) offense, a "freestanding" claim would allow a defendant to bargain strategically, only to later attack the factual sufficiency of his or her plea. Having received the benefit of a lenient plea deal, a defendant should not be permitted to subsequently challenge that conviction on the ground that he or she is "innocent" of the charge of conviction.
Accordingly, where a defendant has pleaded guilty, any "appellate claims challenging what is competently and independently established by [the] plea"—namely, the defendant's factual guilt—are deemed "forfeited" (Plunkett, 19 NY3d at 405). Allowing a defendant to strategically relitigate culpability—at a time when the prosecution's evidence has grown stale, or may be entirely undeveloped—would undermine critical notions of fairness, finality, and sanctity of the legal process, and would "turn the 'solemn act' of pleading guilty into a mere device for maintaining innocence while avoiding trial" (Thomas, 53 NY2d at 345 [citation omitted]; see also New [*10]York State Justice Task Force, Recommendations Regarding Post-{**32 NY3d at 109}Conviction Access to DNA Testing and Databank Comparison at 3 [Jan. 2012] [highlighting "concerns about defendants who would attempt to 'game' the system by failing to seek (DNA) testing until after a plea when it may be harder for a prosecutor to prove his or her case"]). Defendant's guilty plea, by design, limits her postconviction remedies.
The majority indicates that, here, defendant's claim must "presumptively" be rejected because "CPL 440.10 provides defendant with procedural recourse"—her ineffective assistance of counsel claim (majority op at 
102, 103 n 8). But even in the absence of defendant's parallel claim, her "freestanding" claim could not proceed. Neither party suggests otherwise, nor would the law support that notion. Likewise, "the writ of error coram nobis" would not supply an avenue of relief (majority op at 
103 n 8), as the coram nobis procedure cannot be used to create a wholly new remedy where none otherwise exists.
The common-law writ of error coram nobis was largely "abrogated when the Criminal Procedure Law was enacted" (Andrews, 23 NY3d at 611), and it is "not just another stop on a continuum of opportunities for a defendant to seek appellate relief" (People v Rosario, 26 NY3d 597, 602-603 [2015]). Rather, in its modern context, coram nobis is an "extraordinary" form of relief to be provided "only" in a particular subset of "rare cases"—namely, those involving the categorical loss of an appeal due solely to the unconstitutionally deficient performance of counsel (id. at 603 [internal quotation marks and brackets omitted]; People v Arjune, 30 NY3d 347, 356-358 [2017]; Andrews, 23 NY3d at 611-612; Syville, 15 NY3d at 399-401). Indeed, the "related context" identified by the majority involved "a defendant who discover[ed] after the expiration of the CPL 460.30 grace period that a notice of appeal was not timely filed due to ineffective assistance of counsel" (Syville, 15 NY3d at 397). There, the defendant asked the Court to waive a procedural bar—CPL 460.30's one-year time limitation—so as to permit the defendant to pursue his otherwise-untimely appeal (id.). The defendant's claim was premised not on the inadequacy of his available remedies, but rather on the altogether "loss of the right to an appeal caused by deficient legal performance" (Andrews, 23 NY3d at 610).
Nothing remotely resembling that allegation is present where, as here, defendant seeks to assert an entirely new basis for appellate relief. In the "rare" case where it applies, the coram nobis procedure has been used to revive an existing appellate{**32 NY3d at 110} claim that would otherwise be extinguished because of ineffective legal assistance (Andrews, 23 NY3d at 614). Coram nobis "presupposes" an existing violation; it is "not a substitute" for an existing "appeal or other statutory remedy" (Syville, 15 NY3d at 400, citing People v Bachert, 69 NY2d 593, 598 [1987] [internal quotation marks and citations omitted]). In other words, while coram nobis might excuse a procedural defect to permit a defendant to pursue an otherwise-barred appeal, it cannot be used to invent a new, previously-nonexistent appellate claim. Here, then, defendant cannot bring a "freestanding" claim irrespective of her election to pursue an alternative challenge.
Having struck a bargain with the People many months ago, defendant cannot now contest her guilt in a belated, jury-less, free-for-all mini-trial. "In any system of criminal justice, 'innocence' or 'guilt' must be determined in some sort of a judicial proceeding" (Herrera, 506 US at 398). Defendant's guilt was resolved by her guilty plea, and her presumption of innocence has disappeared. She is now entitled to raise any of the various statutorily-prescribed claims that the New York State Legislature has provided her. Whether she does so or not, defendant is not entitled to disturb her conviction based on a "freestanding" claim that it is factually incorrect.

Wilson, J. (dissenting). Natascha Tiger pleaded guilty but is innocent. That conclusion, like the majority decision here, races far ahead of the procedural posture in which this case comes to us. Thus, as I explain in part one, the majority opinion does more than it should and less than it seems. Were the question of whether a guilty plea always forecloses a claim of actual innocence now before us, I would conclude that it does not, for reasons set forth in part two.
I.
Justice Leventhal's opinion for a unanimous Appellate Division sets out the underlying facts in an impressive narrative (149 AD3d 86 [2017]). Procedurally, though, it is important to focus on a few details: (1) Ms. Tiger moved for relief under a statute, CPL 440.10 (1) (h), claiming entitlement to relief thereunder because she was actually innocent and because her trial counsel was ineffective; (2) Ms. Tiger sought, as relief, either the vacatur of her conviction or an evidentiary hearing; (3) the Appellate Division did not grant her motion to vacate her{**32 NY3d at 111} conviction; and (4) the Appellate Division granted her motion for an evidentiary hearing as to her entitlement to relief under CPL 440.10 (1) (h). It is also important to note that the factual bases for Ms. Tiger's innocence and ineffective assistance arguments are virtually identical.
The majority opinion does too much, in that it leaps far ahead of the issue before us (the Appellate Division unnecessarily opined on whether Ms. Tiger's actual innocence claim was cognizable, and the majority followed suit). The precise question is whether Ms. Tiger is entitled to an evidentiary hearing. The Appellate Division held that she is. The majority does not disagree. The majority believes that the hearing should not encompass Ms. Tiger's actual innocence claim, because it does not believe such a claim exists in the face of Ms. Tiger's guilty plea, but that question is not yet here, and may never be.
First, all of the evidence pertinent to Ms. Tiger's innocence is directly relevant to her ineffective assistance claim. So, the majority's decision does not affect the occurrence or the substance of the hearing; at most, it offers an opinion—offered before the lower courts have made any factual findings based on the evidence to be presented at that hearing—as to what we would hold if later presented with a particular result. However, if Ms. Tiger prevails on her ineffective assistance claim below, or fails as a factual matter unreviewable by us, the issue the majority purports to decide will never reach us in this case.
Second, to the extent "obtained in violation of . . . the constitution" in CPL 440.10 (1) (h) refers to a due process concern, that issue cannot be ripe until Ms. Tiger exhausts the other mechanisms available to her to vacate her conviction. Until the lower courts make a determination based on the evidentiary hearing, we cannot yet know whether the process available to her through her claim of ineffective assistance is adequate or inadequate.
Third, related to the second point, we should be wary of deciding the existence of a novel claim when existing claims may provide a petitioner with relief. Ms. Tiger's ability to invoke CPL 440.10 (1) (h) to raise a claim of [*11]ineffective assistance of counsel is well-established; her ability to invoke that statute to raise a claim of actual innocence is novel.
The majority opinion also does far less than it seems. The Appellate Division's analysis (though itself dicta for the reasons stated above) is that CPL 440.10 (1) (h) provides a statutory{**32 NY3d at 112} claim for actual innocence. The majority concludes, inter alia, that the creation of an exception for innocence demonstrated by DNA evidence (440.10 [1] [g-1]) and the public policy favoring finality of guilty pleas, counsel against the proposition that the legislature meant CPL 440.10 (1) (h) to provide an avenue for vacating, on the ground of actual innocence, a conviction obtained by a guilty plea. The majority's opinion (like the Appellate Division decision on review) does not address the question of whether interpreting 440.10 (1) (h) in that manner would render it (or 440.10 taken as a whole) unconstitutional, or whether a claim of actual innocence can be brought under the State or Federal Constitution directly, or under this Court's coram nobis or habeas corpus power, without resort to the CPL.
In short, despite the lengthy exposition in the Appellate Division's decision, I would do no more than recognize the Appellate Division's discussion as dicta in view of the near-total overlap of the factual record needed for the two purported claims, and would avoid deciding issues—particularly novel ones—until necessary and with a full record.[FN1] II.
I disagree with the general thesis of the majority's opinion: that, short of legislative or gubernatorial mercy, no innocent person who pleads guilty, lest exonerated by DNA evidence, may vacate a conviction. Ms. Tiger is neither the first nor last innocent person to plead guilty. Ms. Tiger's case (based on facts as she summarizes them, without the benefit of an evidentiary hearing) provides a compelling example. In brief, confronted by Child Protective Services (CPS) with horrifying photographs of{**32 NY3d at 113} the child's skin blistering, she was: without the assistance of counsel; denied the accompaniment of a representative of her employer who attempted to attend; accused of "having boiled water and thrown it" on the child; and told she was responsible for the skin grafts the child was then undergoing. Ms. Tiger [*12]knew the bathwater was not inappropriately hot, but nevertheless concluded she must have been responsible. Faced with seven years in prison, she pleaded guilty after her lawyer told her she could not afford to hire an expert and a guilty plea could result in a suspended sentence. What she did not then know was that the child was taking medication that likely caused the blistering. Based on the sequence of events leading up to the child's injuries, and her meeting with the CPS interviewer who all but insisted that Ms. Tiger burned the child terribly, it is not hard to imagine that a compassionate and attentive caregiver—which other evidence in the record shows she was—could begin to believe that she somehow made a mistake and was to blame.[FN2]
Subsequently, when the child's family sued Ms. Tiger and her employer for civil damages, the employer, with resources far in excess of those Ms. Tiger possessed, retained an expert and better lawyers. Even though the child's family had to satisfy only the "preponderance of the evidence" standard, and not the "beyond a reasonable doubt" standard, the jury found that Ms. Tiger did not cause the child's injury. Suppose, for a moment, that after the forthcoming evidentiary hearing Ms. Tiger has been awarded, we know with certainty that she did not cause the child's injuries. Must we nevertheless refuse to vacate her conviction?
"The most hallowed principle of our criminal law [is] protecting the innocent" (United States v Watson, 792 F3d 1174, 1183 [9th Cir 2015]). "[T]he requirement of proof beyond a reasonable doubt in a criminal case [is] bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free" (In re Winship, 397 US 358, 372 [1970, Harlan, J., concurring]).{**32 NY3d at 114}
"No tradition is more firmly established in our system of law than assuring to the greatest extent that its inevitable errors are made in favor of the guilty rather than against the innocent . . . Not all share our revulsion at punishment of the innocent, of course. But Americans have always been revolted by the notion that it is better that the innocent suffer than that some of the guilty go free" (Watson, 792 F3d at 1183).
Our modern criminal justice system " 'is for the most part a system of pleas, not a system of trials' " (Missouri v Frye, 566 US 134, 143 [2012], citing Lafler v Cooper, 566 US 156, 170 [2012]). " 'To a large extent . . . horse trading [between prosecutor and defense counsel] determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it is the criminal justice system' " (id. at 144, quoting Robert E. Scott & William J. Stuntz, Plea Bargaining as Contract, 101 Yale L J 1909, 1912 [1992]). In New York State in 2016, less than three percent of nearly 50,000 criminal dispositions went to trial (National Center for State Courts, Court Statistics Project, 2016 Gen. Jurisdiction Criminal Jury Trials and Rates, New York, http://www.ncsc.org/Sitecore/Content/Microsites/PopUp/Home/CSP/CSP_Intro).
We know that some completely innocent people plead guilty. In 2016, a record-setting 166 people were exonerated nationally (The National Registry of Exonerations, Exonerations in 2016 at 2 [2017], https://www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2016.pdf, cached at 
http://www.nycourts.gov/reporter/webdocs/Exonerations_in_2016.pdf). Of those, 74 exonerees, or 45%, were convicted based on guilty pleas (id.).[FN3] Of the nearly 2,000 individuals who were exonerated between [*13]1989 and October 2016, 17% pleaded guilty (Samuel R.{**32 NY3d at 115} Gross, What We Think, What We Know and What We Think We Know About False Convictions, 14 Ohio St J Crim L 753, 755-756 [2017]). The exonerations that we know of are highly skewed towards more serious crimes—
"Non-violent crimes comprise more than 80% of felony convictions but fewer than 20% of exonerations; there are, for example, about three times as many felony convictions for theft as for robbery but one eighth the number of exonerations . . . [t]he inevitable conclusion is that only a tiny fraction of innocent defendants who are convicted of misdemeanors or non-violent felonies are ever exonerated" (id. at 767).
Public and scholarly attention has turned to the problem of convictions of the innocent relatively recently. The majority's attempt to close the door prematurely, with little information as to what lies on the other side, is particularly disturbing.
Research shows that innocent defendants may be motivated to plead guilty for a variety of reasons: most prominently, the threat of a more serious charge and a far longer sentence upon electing to go to trial, the fact that a plea will offer a release from pretrial detention if the offense is low-level, and concerns about the defendant's lawyer or the availability of evidence that would conclusively demonstrate innocence (see Jed S. Rakoff, Why Innocent People Plead Guilty, NY Review of Books [Nov. 20, 2014], available at http://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/; John H. Blume & Rebecca K. Helm, The Unexonerated: Factually Innocent Defendants Who Plead Guilty, 100 Cornell L Rev 157 [2014]).[FN4] A posttrial sentence can be 10 times that of a sentence offered in{**32 NY3d at 116} a plea bargain—the question, then, of whether to accept such a bargain turns on more than simply whether one is guilty or innocent.[FN5] Without much oversight, prosecutors are free to offer the most persuasive plea [*14]bargains where evidence is weakest, so as to avoid having such evidence tested at trial (Blume & Helm at 169)—and so as to all but guarantee an innocent guilty plea. If a defendant has concerns about the sufficiency of counsel's representation, for example, what sense would there be in forgoing a two-year sentence that could become 20? Indeed, "[w]hen the deal is good enough, it is rational to refuse to roll the dice, regardless of whether one believes the evidence establishes guilt beyond a reasonable doubt, and regardless of whether one is factually innocent" (Schmidt v State, 909 NW2d 778, 787-788 [Iowa 2018] [internal quotation marks omitted]). More vulnerable defendants, such as juveniles, are also more likely to plead guilty falsely (Allison D. Redlich & Reveka V. Shteynberg, To Plead or Not to Plead: A Comparison of Juvenile and Adult True and False Plea Decisions, 40 Law & Hum Behav 611, 617 [2016]).
Although the United States Supreme Court has held that the disparity in post-plea and posttrial sentencing does not render a plea unlawful (Brady v United States, 397 US 742, 751 [1970]), that doctrine cannot mask what transpires. Retired Federal Judge Nancy Gertner has lamented the incongruity between the reality of plea bargaining and a finding of coercion:
"there were times during my seventeen-year tenure on the federal bench in Massachusetts that inquiring of a defendant as to the voluntariness of his guilty plea felt like a Kabuki ritual. 'Has anyone coerced you to plead guilty,' I would ask, and I felt like adding, 'like thumbscrews or waterboarding? Anything less than that—a threatened tripling of {**32 NY3d at 117}your sentence should you go to trial, for example—doesn't count' " (Nancy Gertner, Bruce Brower & Paul Shechtman, 'Why the Innocent Plead Guilty': An Exchange, NY Review of Books [Jan. 8, 2015], available at http://www.nybooks.com/articles/2015/01/08/why-innocent-plead-guilty-exchange/).[FN6]
We have made careful choices to prohibit the waiver of certain fundamental rights, in part because of our concern that failure to do so would encourage innocent defendants to wrongly plead. Speedy trial claims, for example, may not be waived, "because trial delay may result in the loss of evidence or an accused's inability to respond to criminal charges, thereby compelling innocent persons to plead guilty out of necessity. Because of this societal interest, a defendant may not waive such claims" (People v Seaberg, 74 NY2d 1, 9 [1989] [emphasis added]). We should not foreclose the possibility that other factors in our criminal justice system also may "compel[ ] innocent persons to plead guilty out of necessity."
Relatedly, we also know that innocent suspects falsely confess.[FN7] Research shows that juveniles, as well as developmentally disabled and mentally ill defendants are especially vulnerable{**32 NY3d at 118} to false confessions (Richard A. Leo, False Confessions: Causes, Consequences, and Implications, 37 J Am Acad Psychiatry L 322, 335 [2009]). More than 20% of known exonerations for murder were at least in part due to false confessions (Gross at 772). Still, we do not know how frequently they occur (Leo at 333). Consistently with the research on guilty pleas, the research on false confessions shows that "[t]he most potent psychological inducement is the suggestion that the suspect will be treated more leniently if he confesses and more punitively if he does not" (id. at 339).
III.
The majority is focused on the importance of the finality of the plea process, and the appropriate conservation of judicial resources (majority op at 
100-102). Those concerns are weighty. But "conservation of judicial resources" does not appear alongside "life, liberty and the pursuit of happiness." It is not impossible, as the majority seems to imply, to redress exceptional cases in which a clearly innocent person has pleaded guilty, and simultaneously to avoid eroding the fundamentals of our criminal justice system.[FN8] When the postconviction remedy for DNA evidence was [*15]in progress (now CPL 440.10 [1] {**32 NY3d at 119}[g-1]), a government task force recommended the "substantial probability" evidentiary standard based on "the need to provide a formal mechanism to exonerate the innocent post-plea, while also acknowledging the importance of preserving the integrity of the plea process, maintaining a level of finality in the system and attempting to prevent frivolous petitions from guilty defendants seeking to take advantage of the system" (New York State Justice Task Force, Recommendations Regarding Post-Conviction Access to DNA Testing and Databank Comparisons at 3-4 [Jan. 2012]). None of the parade of horribles that the majority now threatens has come to bear with the DNA exception.[FN9] There is no reason, then, that the court system could not similarly withstand such allowances under similar claims of actual innocence. According to the National Registry of Exonerations, only 22% of exonerations from 1989 to 2016 were based in whole or in part on DNA evidence; for 2016, that figure was only 10% (Exonerations in 2016 at 5). Thus, in the vast majority of cases no DNA evidence is involved, [*16]yet other courts around the nation appear to be able to determine innocence, postconviction, without causing the criminal justice system to crumble. Certainly, those states are not freeing all persons wrongly convicted, but some is better than none.
I agree with the majority that rules are important. I also agree that exceptions should not be allowed to swallow rules. But exceptions are just that—exceptional. Unless forbidden by this Court, it is not beyond the ability of our courts to identify the exceptional circumstances in which someone who has pleaded guilty should be entitled to have her conviction vacated. This Court's role, over time, should be to fix the contours of that exception, instead of concluding it would be easier just to shut the door tight. Barring that door is particularly inappropriate here, when Ms. Tiger may well be able to exit her{**32 NY3d at 120} cell through another—her claim of ineffective assistance of counsel, where we have proved able to define the contours of that claim under CPL 440.10 without laying waste to the finality of convictions.
Former Chief Judge Jonathan Lippman, who created the New York State Justice Task Force on Law Day 2009, described our courts' mission thus:
"Every wrongful conviction is a stain on the reputation of the courts, eroding public trust and confidence in the legitimacy of our institutional status and the fairness and accuracy of our decisions. This only underscores why the judiciary, the focal point of the entire justice system, is absolutely duty-bound to lead the way in making sure that the criminal justice process is as fair and accurate as humanly possible" (Chief Judge Jonathan Lippman, Judiciary Examines Causes of Wrongful Convictions, 26 Criminal Justice [No. 3] 5, 6 [Fall 2011], available at http://www.nyjusticetaskforce.com/2011.Fall.ABA.CriminalJusticeArticle.by.Lippman.pdf).
Today's decision inexplicably and unnecessarily denies that mission, eschewing our obligation in favor of further legislative action or executive clemency. I will not.
Judges Stein, Fahey, Garcia and Feinman concur; Judge Garcia in a concurring opinion; Judge Wilson dissents in an opinion in which Judge Rivera concurs.
Order, insofar as appealed from, reversed and that branch of defendant's CPL 440.10 motion which was based on an independent claim of actual innocence denied.

Footnotes

Footnote 1:TEN and SJS are dermatological conditions that are associated with an adverse reaction to certain medications, particularly antibiotics and antiseizure medications. The clinical signs for each condition are very similar and the appearance of the skin in both cases is very much like that of a scald burn.

Footnote 2:The civil jury rendered its verdict shortly after defendant brought this CPL article 440 motion.

Footnote 3:The People do not challenge the portion of the order reversing and remitting for a hearing on defendant's ineffective assistance of counsel claim.

Footnote 4:Contrary to the position taken by the dissent, the existence of a freestanding claim of actual innocence under CPL 440.10 (1) (h) for a defendant who has pleaded guilty is a question of law presented for our review. Indeed, whether defendant is entitled to a hearing on her actual innocence claim is the only question presented by this appeal. Defendant properly preserved her actual innocence claim in her CPL 440.10 motion. And, although the proof supporting this claim may overlap with her ineffective assistance of counsel claim, she seeks relief asserting both a different remedy—dismissal of the accusatory instrument—and the application of a different legal standard under Hamilton. Thus, there is simply no basis for the conclusion that the question of whether defendant can bring an actual innocence claim under CPL 440.10 (1) (h) must be left for another day.

Footnote 5:This general rule is subject to exceptions not implicated here (see e.g. Class v United States, 583 US —, — - —, 138 S Ct 798, 804-805 [2018]; Menna v New York, 423 US 61, 62 [1975]; Blackledge v Perry, 417 US 21, 30 [1974]).

Footnote 6:The dissent, in apparent support of an expansion of this State's extant postconviction relief for claims of actual innocence relies on a statistic gleaned from the website of "the National Registry of Exonerations"—that 45% (74/166) of the defendants exonerated nationally in 2016 had pleaded guilty (https://www.law.umich.edu/special/exoneration/Documents/Exonerations_in_2016.pdf [last accessed June 5, 2018], cached at 
http://www.nycourts.gov/reporter/webdocs/Exonerations_in_2016.pdf). Upon further review of the information provided by the National Registry, more than 75% of those plea convictions were drug possession cases, and many involved false laboratory reports and official misconduct (see id.). Exonerations attributed to government misconduct fit within the statutory framework of CPL 440.10. The statute essentially allows a defendant to assert a claim of actual innocence by moving to vacate a conviction obtained after a guilty plea on multiple grounds, including government fraud, misconduct and misrepresentations, as well as constitutional violations (see e.g. People v Seeber, 94 AD3d 1335, 1338 [3d Dept 2012]).

Footnote 7:In any event, we note that such a claim would be unavailable in light of defendant's guilty plea.

Footnote 8:In a related context, we have invoked the writ of error coram nobis to "alleviate a constitutional wrong when a defendant has no other procedural recourse" (People v Syville, 15 NY3d 391, 400 [2010]; People v Andrews, 23 NY3d 605, 611 [2014]). Here, however, CPL 440.10 provides defendant with procedural recourse to alleviate any constitutional wrongs, such as her claim that her guilty plea was unconstitutionally obtained due to ineffective assistance of counsel, and she may proceed with her CPL article 440 challenge on that basis. Notably, New York State also allows for a defendant to seek a pardon from the governor specifically based on a claim of innocence (see Executive Law § 19; Herrera, 506 US at 417 ["History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency"]).

Footnote 9:We note that the issues of whether a defendant convicted after trial can raise a freestanding claim of actual innocence under CPL 440.10 (1) (h), and, if so, the procedural requirements of such a claim, are not currently before us.

Footnote *:Notably, the state legislature has repeatedly considered and rejected proposed legislation that would explicitly add a broader "actual innocence" claim to the Criminal Procedure Law (see 2017 Senate-Assembly Bill S351, A4689; 2016 Senate-Assembly Bill S1299, A5077; 2013 Senate-Assembly Bill S49, A3492).

Footnote 1:The majority's explanation of why it is putting the cart of actual innocence before the horse of an evidentiary hearing exposes the opinion's fundamental failure. The majority explains that "whether defendant can bring an actual innocence claim under CPL 440.10 (1) (h)" cannot "be left for another day" because Ms. Tiger "seeks relief asserting both a different remedy—dismissal of the accusatory instrument—and the application of a different legal standard under Hamilton" (majority op at 
98 n 4). The majority's rationale for overreaching thus depends on presumed outcomes as to the applicable standard of proof and eventual remedy were such a claim to exist. Neither the applicable standard of proof nor the remedy is before us, and our Court is surely not bound to what Hamilton says or what Ms. Tiger requests. The rationale is also tautological, finding the issue squarely presented because of a standard of proof and remedy that might apply to a claim the majority deems nonexistent. That the proof at Ms. Tiger's evidentiary hearing will be unchanged by today's decision pointedly illustrates the advisory nature of the majority's opinion.

Footnote 2:Cf. The Arabian Nights at 248 (1990, Husain Haddawy, trans, Muhsin Mahdi, ed) (in which a tailor moves a body to make it seem like a doctor was the killer; the doctor moves the body to frame the Sultan's purveyor; the purveyor moves the body so that a merchant believes he struck the fatal blow, and each eventually, to prevent the execution of his successor to the body, confesses to killing the man, who really died from choking on a fishbone when eating a meal provided to him by the tailor and his wife in kindness).

Footnote 3:The majority helpfully explains this data in more detail (majority op at 
101-102 n 6) by pointing out that numerous people who (presumably) know they are innocent—or perhaps, like Ms. Tiger, mistakenly believe they might be guilty—nevertheless plead guilty when presented with damning fabricated evidence. As the majority emphasizes, many of the exonerees on the list were convicted based at least in part upon "forensic information that was (1) caused by errors in forensic testing, (2) based on unreliable or unproven methods, (3) expressed with exaggerated and misleading confidence, or (4) fraudulent" or, via official misconduct, where "[p]olice, prosecutors, or other government officials significantly abused their authority or the judicial process in a manner that contributed to the exoneree's conviction" (The National Registry of Exonerations, Glossary, https://www.law.umich.edu/special/exoneration/Pages/glossary.aspx#FMFE, cached at 
http://www.nycourts.gov/reporter/webdocs/ExonerationGlossary.pdf). That CPL 440.10 has specific provisions providing the possibility of relief to some innocent persons is of no comfort to others who do not neatly fit into one or another.

Footnote 4:
"[U]ntil today, [the plea bargain] has been regarded as a necessary evil. It presents grave risks of prosecutorial overcharging that effectively compels an innocent defendant to avoid massive risk by pleading guilty to a lesser offense; and for guilty defendants it often—perhaps usually—results in a sentence well below what the law prescribes for the actual crime. But even so, we accept plea bargaining because many believe that without it our long and expensive process of criminal trial could not sustain the burden imposed on it, and our system of criminal justice would grind to a halt" (Lafler v Cooper, 566 US 156, 185 [2012, Scalia, J., dissenting]).
Footnote 5:In Schmidt v State (909 NW2d 778, 787-788 [Iowa 2018]), the Iowa Supreme Court ruled that the Iowa Constitution permits a freestanding claim of innocence to be brought even if a defendant knowingly and voluntarily pleaded guilty. The Court acknowledged that innocent defendants plead guilty for many reasons, including the threat of a much longer sentence. Mr. Schmidt, the defendant in that case, explained, "I was not guilty. I was scared so I pled guilty [be]cause I was fac[ing] over [fifty] years" (id. at 783). Pursuant to his plea agreement, Mr. Schmidt was instead sentenced to seven years.

Footnote 6:As our former Chief Judge famously observed, "any prosecutor who wanted to could get a Grand Jury to indict a ham sandwich" (David Gould, Sol Wachtler, Historical Society of the NY Courts, http://www.nycourts.gov/history/legal-history-new-york/history-legal-bench-court-appeals.html?http://www.nycourts.gov/history/legal-history-new-york/luminaries-court-appeals/wachtler-sol.html; see also Alex Kozinski, Criminal Justice 2.0, 44 Geo L J Ann Rev Crim Proc iii, xi-xii [2015] ["Many people, including judges, take comfort in knowing that an overwhelming number of criminal cases are resolved by guilty plea rather than trial. Whatever imperfections there may be in the trial and criminal charging process, they believe, are washed away by the fact that the defendant ultimately consents to a conviction. But this fails to take into account the trend of bringing multiple counts for a single incident—thereby vastly increasing the risk of a life-shattering sentence in case of conviction—as well as the creativity of prosecutors in hatching up criminal cases where no crime exists and the overcriminalization of virtually every aspect of American life. It also ignores that many defendants cannot, as a practical matter, tell their side of the story at trial because they fear being impeached with prior convictions or other misconduct. And, of course, if the trial process is perceived as highly uncertain, or even stacked in favor of the prosecution, the incentive to plead guilty to some charge that will allow the defendant to salvage a portion of his life, becomes immense"]).

Footnote 7:Many high-profile cases have underscored this issue, such as the Central Park jogger case (Susan Saulny, Convictions and Charges Voided In '89 Central Park Jogger Attack, NY Times, Dec. 20, 2002, available at https://www.nytimes.com/2002/12/20/nyregion/convictions-and-charges-voided-in-89-central-park-jogger-attack.html?pagewanted=all&src=pm).

Footnote 8:State high courts in Texas and Iowa have held that guilty pleas do not foreclose claims of actual innocence; Texas over 20 years ago. In Ex parte Tuley the court reasoned, "The policy supporting our holding in Elizondo, that the punishment of an innocent person violates federal due process, is the same for an applicant regardless of whether his case was heard by a judge or jury or whether he pleaded guilty or not guilty" (109 SW3d 388, 390 [Tex Crim App 2002]). The court rebutted the State's argument that allowing such a claim would open the floodgates:
 "As the cases the State cites show, claims of actual innocence are rare and the cases in which relief is granted are even more rare. . . . We are confident that the convicting courts of Texas can tell the difference between a meritorious claim of actual innocence accompanied by compelling new evidence and a bogus claim accompanied by bare allegations of innocence. Applicants may file applications, but it does not mean that convicting courts will recommend granting relief" (id. at 394-395).
In Schmidt v State, the Iowa Supreme Court explained,
"a clear and convincing standard balances the interest of an innocent defendant and that of the state. . . . [W]e believe 'it is far worse to convict an innocent person than to acquit a guilty one' such that 'the scale tips in favor of the [defendant's] interest.' Thus, we simultaneously vindicate this principle and recognize the interest of the state in finality of criminal litigation by adopting a clear and convincing standard" (909 NW2d at 797 [citation omitted]).
Footnote 9:In contrast to the majority's doomsday conjecture, the Texas Court of Criminal Appeals, armed with facts, noted:
 "Applicants have been permitted to file bare innocence claims in the courts of this State since [Ex parte Elizondo, 947 SW2d 202 (Tex Crim App 1996)] was handed down six years ago. The flood of applications has not materialized . . . Since Elizondo was handed down, in a few cases when applicants have presented credible and compelling new evidence of innocence that met the Elizondo standard, innocent people have been released from punishment. The criminal justice system has done justice" (Ex parte Tuley, 109 SW3d 388, 395 [Tex Crim App 2002]).
Another 16 years have passed since that observation, and the wheels of justice continue apace in Texas.